IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA, WESTERN DIVISION

| | |
|---|---|
| GRAHAM YATES and ) | (EDNC File No.5:12-cv-00752-FL) |
| BECKY YATES, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| AIR & LIQUID SYSTEMS ) | |
| CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Graham Yates developed mesothelioma due to exposure to asbestos from Defendant's Bendix brake products. Yates's testimony about his exposures to asbestos Bendix brakes as a service station employee and through vehicle maintenance with Bendix brakes is uncontradicted. The testimony of the Yates's expert witnesses establishes that the type of exposures to asbestos Bendix products described by Yates amounted to a substantial factor in the development of his disease. As a result, Defendant's motion challenging the Yates's products liability claims against Ford should be denied.

**I.     STATEMENT OF FACTS**

Doctors diagnosed Graham Yates with mesothelioma due to asbestos exposure. **Ex. A**, Yates Video Deposition at 8:21-9:13. Yates recounted being exposed to asbestos through putting brakes on personal vehicles, working in service stations, and filling part orders for the North Carolina Department of Transportation vehicles. *Id.* at 9:6-13, 79:5-82:16.

Yates installed Bendix brakes on his 1957 Plymouth and his brother's 1950 Nash Ambassador. *Id.* at 17:22-26:15, Ex. 3. He changed the brakes once on the front wheels of 1957

Plymouth, which required him to use two asbestos Bendix brake pads per wheel (or four total asbestos brake pads for the two wheels). *Id.* He performed the brake change after he purchased the vehicle in 1960. *Id.* Yates replaced the brakes in his brother's 1950 Nash Ambassador during the late 1950s. *Id.* He again used four asbestos Bendix brake pads as each of the four wheels required two pads. *Id.* The Bendix brakes for both vehicles were purchased at Barnes Motor & Parts on South Wilmington Street in Raleigh, North Carolina. *Id.*

To change the brakes, he pulled the tire and rim off of the vehicle to get to the brake. *Id.* at 11:3-10, 20:5-21:17, 24:5-25:1. Then, he pulled off the brake hub to expose the brake lining. *Id.* Next, he used a tool to release a spring that released the brake shoes and pulled them out. *Id.* Yates had to clean the brake drum with a brake brush before he could put on the new brakes. *Id.* at 12:4-13:16, 20:5-21:17, 24:5-25:1. Cleaning the brake drum took a few minutes depending on how bad the brake dust was and filled the air with visible dust. *Id.* Yates breathed that dust. *Id.* After cleaning the brake, Yates sanded the new brake pads to rough them up and give them more friction instead of replacing a worn drum. *Id.* at 13:17-14:18, 20:5-21:17, 24:5-25:1. He used sandpaper to accomplish the task. *Id.* Sanding the brake pad created visible dust and Yates breathed that dust. *Id.*

Yates knew that the brakes he used on the Plymouth and the Nash Ambassador were Bendix brakes because he purchased them himself. *Id.* at 17:22-26:15. The brake pads came four to a cardboard box and "Bendix" was stamped on the box. *Id.* The boxes did not have any warnings about the dangers of asbestos when Yates purchased them. *Id.* He would have followed such a warning if there had been one.

While in high school (around 1956-1957), Yates worked at two different Esso gas stations. *Id.* at 68:24-69:25, 71:1-12 (Upchurch Esso and Daniels Esso). He worked at the gas

stations as part of an on-the-job training course through his school. *Id.* The course allowed him to leave school and go to work late in the afternoon until around 10:00 pm. *Id.* Yates worked full-time (six days a week from 8:00 am to 6:00 pm) at the gas stations in the summertime. *Id.* at 70:1-25. His job as an attendant required that he pump gas, wash windshields, help the mechanics, put oil in cars, repaired tires, and took parts to the mechanics. *Id.* at 71:13-20, 72:1-5. The mechanics at the Esso stations did brake work and other general tune-up work for the most part. *Id.* at 72:1-10.

The Upchurch station had two bays for mechanics and a third bay that included a car wash. *Id.* at 72:11-16. Yates discussed the frequency of brake jobs at the Upchurch station: "Usually do three or four jobs a week. . . some weeks they may do two or three a day and for a total of maybe a dozen brake jobs. The next week they may not do but one. So it was no set number." *Id.* at 72:19-73:1, 76:2-12 (explaining that each change usually involved four brake shoes). He participates in at least half of them. *Id.* at 76:18-77:1. As a helper, Yates delivered the parts to the mechanics, handed him tools, brakes or brake linings while he stood side-by-side with the mechanic changing the brakes. *Id.* at 73:2-19. The mechanics used the same general process as Yates used on his personal vehicles, but a lot of times also used a pressurized air hose to clean out the drums. *Id.* at 73:20-76:1. The pressurized air made the air around Yates fill with dust. *Id.* Yates breathed that dust and the dust created when the mechanics sanded the new brakes. *Id.*

The owner of the Upchurch Esso was particular about cleanliness, so the floors were swept after the mechanics finished their brake work for the day. *Id.* at 77:2-78:13. The floor of the station had an accumulation of brake dust after work was done. *Id.* Yates recalled:

> Well, the mechanic was supposed to [sweep] but seldom did. So we wound up having to do that. And I say "we." It was a couple of us that worked there, so

> generally both of us would get a broom because it was two bays. And this would
> be close to 10:00 at night, so we were ready to . . . get off. You didn't do it till it
> was time to close. So we would try to hurry up and the two of us would do it, but
> it took awhile because it was a lot of dust. . . usually 20 minutes or so per bay.

*Id.* Yates breathed the brake dust while sweeping. *Id.*

Both Esso stations used Bendix brakes. *Id.* at 78:14-79:7. The name "Bendix" was stamped on the box, but Yates did not see any warnings about asbestos. *Id.* Yates would have followed such a warning if he had seen it.

In 1961 or 1962, Yates went to work for the North Carolina Equipment Depot. *Id.* at 79:8-82:16. The Equipment Depot supplied vehicle parts and supplies, including brakes, to the North Carolina Department of Transportation. *Id.* Yates worked there for two years, five days a week from 7:00 am to 4:00 pm as a clerk. *Id.* The brakes were stored in bins at the facility. *Id.* To fill an order, Yates took an approved requisition order and went about pulling all of the items requested from their various locations in the warehouse. *Id.* He had to check to make sure that the number of brakes listed on the requisition form were pulled from the bins. *Id.* The order was checked a second time when it was placed on the truck so that the driver could verify that the order was correct. *Id.* Checking the numbers required Yates to open the brake boxes multiple times. *Id.* at 82:17-25.

The Equipment Depot provided parts for hundreds of vehicles. *Id.* at 83:9-19. Bendix manufactured the brakes that Yates handled at the Equipment Depot. *Id.* Yates knew that the brakes were Bendix because the name was, again, stamped on the box. *Id.* As to frequency, Yates testified: "Dozens. Remembering that they came here once a month generally . . . They ordered them that would last them for their 30 days . . . ." *Id.* Opening the boxes of Bendix brakes revealed dust residue in the box. *Id.* Opening the box released dust into the air that Yates could see. *Id.* He breathed that dust. *Id.*

As for Honeywell, Defendant admits that it has sold brake products under the name Bendix that contained asbestos from 1939 to 2001. *See* **Ex. B**, Defendant Honeywell International, Inc.'s Objections and Responses to Plaintiffs' First Set of Master Interrogatories to All Defendants, Feb. 27, 2008, ("Honeywell Interrogatory Responses") at 8.[1] Even before Yates was exposed to asbestos dust from Bendix brakes, Bendix was aware that its brake products could cause asbestos-related disease. On September 10, 1966, *Chemical Week* published a report stating that federal regulation of asbestos as a cancer and asbestosis hazard could lead to market opportunities for the plastics industry. The article was passed on by the Bendix Director of Purchasing, Ernie Martin, to Noel Hendry who was the asbestos fiber sales manager at Johns-Manville's mine in Asbestos, Quebec. In a letter dated Sept. 12, 1966, Mr. Martin stated:

> My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause.

*See* **Ex. C**, Letter dated Sept. 12, 1966, to Noel Hendry from E. A. Martin with enclosure: Article entitled "Asbestos: Awaiting 'Trial.'" Bendix did not place any warnings on its brakes until 1973, long after Yates was exposed to its products. Honeywell Interrogatory Responses at 13.

Dust studies done at Bendix's Ontario friction product manufacturing plants in the 1970s measured exposure in areas where the employees drilled, riveted and ground asbestos brake products with dust protection measures in place, and found measurements of 0.09, 0.14, 0.49 and 0.77 f/cc. In November 1979, again with dust protection measures in place, measurements of 1.8, 4.3, and 5.9 f/cc were found. **Ex. J**, *Memorandum of Dust Studies at Bendix, Walkerville, Ontario* (August 24, 1976 and May, June, July 1977); **Ex. K**, Ontario Ministry of Labour, *Field Visit Report, Dust Studies at Bendix, Windsor, Ontario* (January 9, 1979).

---

[1] Honeywell is the successor-in-interest to AlliedSignal Inc., which, in turn, was the successor-in-interest to The Bendix Corporation. *Id.* at 1.

Plaintiffs' experts have confirmed that the exposures Yates described to Bendix asbestos-containing brakes were a substantial factor in causing his disease. Dr. Eugene Mark, a pathologist reviewed the medical materials in this case, Yates's testimony, the relevant studies, and the report of industrial hygienist Steve M. Hays. **Ex. L**, Mark Declaration at 1-4; *see also* **Ex. M**, Hays Report and Supplement. Dr. Mark explained that the studies show that the activities described by Yates--- cleaning brake drums, sanding new brake pads, handling brake boxes, and sweeping up after brake changes--- resulted in substantial exposures to asbestos:

- Handling Brakes: M. Atkinson, M. O'Sullivan, S. Zuber, R. Dodson, *Evaluation of the Size and Type of Free Particulates Collected From Unused Asbestos-Containing Brake Components as Related to Potential for Respirability*, Am. J. Ind. Med. 46:545-553 (2004) ("[A]ny manipulation of new asbestos containing brake components would be expected to yield dust containing chrysotile asbestos of respirable size.").

- Opening Boxes: The Friction Materials Standards Institute ("FMSI") Asbestos Study Committee acknowledged that asbestos exposures occur **just from opening boxes** containing new friction products. The Committee stated, "with undusted linings from a manufacturer [,] it is likely that customer inspection, or possibly opening of cartons, could show airborne fiber concentrations in excess of the 5 fiber/cc (TWA)." Minutes of the FMSI's Asbestos Study Committee (February 16, 1973); MAS Study, "Opening Brake Shoe Boxes: Asbestos Air and Fabric Analysis Results" (2003) (measuring concentrations of asbestos fibers of up to .67 fibers per cubic centimeter (fibers/cc) in personal air samples of those opening brake shoe boxes); MVA Scientific Consultants, "Analysis of General Motors Brakes for Asbestos," Feb. 19, 2008, 2-3 (finding that asbestos fibers were readily released from merely touching asbestos-containing brake linings); A.K. Madl, et al., *Exposure to Chrysotile Asbestos Associated with Unpacking and Repacking Boxes of Automobile Brake Pads and Shoes*, Ann. Occup. Hyg. 52(6):463-479, 463 (2008) (study funded by auto makers finding "average airborne chrysotile concentrations (30 min) ranged from 0.086 to 0.368 and 0.021 to 0.126 f cc$^{-1}$ for a worker unpacking and repacking 4–20 boxes of brake pads and 4–20 boxes of brake shoes, respectively").

- Changing Brakes: 1986 EPA document, "millions of asbestos fibers can be released during brake pad and clutch servicing…Asbestos released into the air lingers around a garage long after a brake job is done and can be breathed in by everyone inside a garage, including customers." *Guidance for Preventing Asbestos Disease Among Auto Mechanics* (June 1986), Environmental Protection Agency. A 1997 study performed by industrial hygienist Dr. James Millette dealing with asbestos-containing brake shoes and brake disc pads manufactured by Ford, during the sanding of brakes asbestos fiber levels were 2.2 fibers/cc (PCM), 54.0 structures per cubic centimeter, and during the sweeping

of dust and debris asbestos fiber levels were 1.7 fibers/cc (PCM). James R. Millette, Ph.D., MVA, Friction Product Fiber Release Studies, Jan. 29, 1997. Dr. Millette further states that "sanding an asbestos-containing brake shoe friction product with coarse sandpaper released high levels of asbestos fibers in the breathing zone of the sander."

- Sweeping: James R. Millette, Ph.D., MVA, Friction Product Fiber Release Studies, Jan. 29, 1997 ("sweeping of the asbestos-containing dust and debris following sanding can release significant levels of asbestos fibers into the air (over 1 f/cc).").

Dr. Mark Dec. at 4-7.[2] Based on all of the materials available, Dr. Mark concluded that the exposures to asbestos through Bendix brakes described by Yates caused him to develop mesothelioma. *Id*. at 1, 4-9, 11-12, 28-29 (explaining the exposures from the activities that Yates described were thousands of times greater than the background level of asbestos in the air and that mesothelioma is a dose-responsive disease). He concluded: "with a reasonable degree of

---

[2] The Environmental Protection Agency has found that the process of servicing brakes and clutches can release millions of asbestos fibers, and grinding or beveling friction products "can cause even higher exposures." **Ex. D**, United States Environmental Protection Agency's *Guidance for Preventing Asbestos Disease Among Auto Mechanics* (June 1986), ("EPA Guide") at 1. The types of exposures that contribute to the hazard include using a compressed air hose to clean drum brakes, which can release up to 16 million asbestos fibers in the cubic meter of air around a mechanic's face. *See id.* at 4. While lowering exposure lowers risk, there is no known level of exposure to asbestos below which health effects do not occur. *See id.* at 1.

Multiple studies from a variety of different sources confirm that significant levels of airborne asbestos dust are generated by the use of compressed air. Hickish and Knight, Industrial Hygiene Specialists for Ford in Great Britain, reported a time weighted average of 1.25 fibers per cubic centimeter of air (fiber/cc) for blowing out car brakes and of 1.75 fiber/cc for blowing out truck brakes. **Ex. E**, Hickish & Knight, *Exposure to Asbestos during Brake Maintenance,* ANN. OCCUP. HYG., 13:17-19 (1970); *see also* **Ex. F**, K.L. Knight, D.E. Hickish, *Investigations Into Alternative Forms of Control For Dust Generated During the Cleaning of Brake Assemblies and Drums*, ANN. OCCUP. HYG.13: 37-39 (1970) (blow-off personal sample yielded 5.35 f/cm$^3$ and peak sample 87 f/cc). Similarly, a 1987 study found that, "grinding of new linings is an operation that may cause heavy exposure unless the enclosure and the local ventilation are efficient." **Ex. G**, Kauppinen & Korhonen, *Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods*, 48 AM. IND. HYG. ASSOC. J. 499-504 (1987). In fact, grinding asbestos brakes for one hour without exhaust ventilation resulted a time-weighted average of almost 10 f/cc. *Id.*

Other studies have shown that asbestos fibers generally remain the air long past the time they are released by work with asbestos-containing products. For example, a study of the removal of asbestos ceiling material found that asbestos "contamination persisted for over 24 hours, and containment of fibers was difficult." **Ex. H**, Sawyer, *Asbestos Exposure in a Yale Building*, ENV RESEARCH 13:146-169, 164 (1977); *see also* **Ex. I**, Rohl, et al.*, Asbestos Exposure During Brake Lining Maintenance and Repair*, Env'l Research, 12:110-128 (1976). Dr. Arthur Rohl and his colleagues at Mount Sinai also reported on the average concentrations from blowing the dust out of brake drums with compressed air jets and **found a mean fiber concentration of 16 fibers/cc and measurable concentrations of asbestos fiber fifteen minutes after the brake blow out up to 75 feet away**. *Id.*

medical certainty that Mr. Graham Yates' exposure to asbestos-containing Bendix brakes was a substantial contributing factor and medical cause in the development of his diffuses malignant mesothelioma of the pleura." *Id.* at 29.

## II. SUMMARY JUDGMENT STANDARD

The standard for summary judgment pursuant to Federal Rule 56 is well defined. Summary judgment is appropriate only when there is no genuine issue of material fact, and movant has met its burden of proof that it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In reviewing the evidentiary record, all facts and inferences therefrom must be viewed in the light most favorable to the nonmovant. *See, e.g. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Only if the moving party has carried its initial burden under Rule 56, the nonmovant must show more than a "metaphysical doubt as to the material facts;" it must present affirmative evidence to create a genuine fact issue. *Id.* at 586-87.

## III. ARGUMENT AND AUTHORITIES

A. **Bendix Brakes Released Asbestos Fibers that Caused Yates's Mesothelioma.**

Under North Carolina law, a plaintiff in an asbestos action must demonstrate that he was "actually exposed" to the defendant's asbestos-containing product. *Wilder v. Amatex Corp.*, 314 N.C. 550, 336 S.E.2d 66, 68 (N.C. 1985). In applying North Carolina law, the Fourth Circuit Court of Appeals has employed the *Lohrmann* exposure standard in requiring that a plaintiff present "'evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.'" *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 (4th Cir. 1995) (quoting *Lohrmann v. Pittsburgh-Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986)). This Court has previously followed *Jones* and

applied the *Lohrmann* standard in North Carolina cases. *See Jandreau v. Alfa Laval USA, Inc.*, No. 2:09-91859-ER, 2012 U.S. Dist. LEXIS 88586, at *8-9 (E.D. Pa. May 1, 2012) (**Ex. N**); *Mattox v. Am. Std.*, No. 2:07-73489, 2011 U. S. Dist. LEXIS 105267, at *4-5 (E.D. Pa. July 11, 2011) (**Ex. O**).

In adopting the frequency, regularity, and proximity standard, the *Lohrmann* court explained that, "[i]n effect, this is a *de minimis* rule since a plaintiff must prove more than a casual or minimum contact with the product." *Lohrmann*, 782 F.2d at 1162. Indeed, in *Jones*, circumstantial evidence that the plaintiff worked in the same area of the plant as his two co-workers, and that the co-workers identified specific asbestos-containing products used in that area, was sufficient to meet this standard even if the co-workers could not say that the plaintiff was present during the use of the products. *See Jones*, 69 F.3d at 717, 717 n.3.

Here, there is no doubt that Yates was actually exposure to Bendix asbestos-containing brakes. Honeywell admits that its brake products contained asbestos during the 1950s and 1960s. Moreover, Defendant has failed to bring this Court any evidence to contradict Yates's testimony that: (1) he brake jobs on a 1957 Plymouth and a 1950 Nash Ambassador with Bendix replacement brakes; (2) he performed brake changes in a manner that released visible dust that he breathed; (3) he worked at two different service stations assisting with brake changes and handling brakes full time in the summers and part time in school year; (4) he breathed visible dust from being in close proximity to mechanics doing Bendix brake changes; (5) he swept up occasionally after those mechanics performed such work; and (6) he opened boxes of Bendix brakes multiple times a day for two years at the North Carolina Equipment Depot.

Just as there is not evidence to contradict Yates's evidence of exposure, Honeywell has not brought any evidence to show the exposures described by Yates were not causative. It

attempts to distract from those exposures by pointing the Court to other exposures Yates experienced. However, as detailed in Dr. Mark's declaration, mesothelioma is a dose-responsive disease and the presence of other causative exposures does not render another exposure above background non-causative. Rather Dr. Mark explained "that diffuse malignant mesothelioma is a dose-response disease and that the resulting disease is the cumulative result of the exposures to asbestos that a person receives. That is, the more someone is exposed to and thereby breathes asbestos, the greater his risk for developing diffuse malignant mesothelioma." Dr. Mark Dec. at 11 (also see his description of Dr. Welch's paper).

The Yates's evidence is certainly sufficient to meet the *Lohrmann* frequency, regularity, and proximity test. Yates performed two brake jobs on personal vehicles. The evidence showed that he cleaned the dust from the brake drums, and was repetitively exposed to asbestos dust others performing similar work. Sweeping up after brake changes in closed quarters and, finally, from handling Bendix brake boxes over the course of his employment. The industrial hygiene evidence shows that significant asbestos exposure is caused by this work. Plaintiffs' expert medical evidence establishes that such exposures were a substantial cause of Yates's mesothelioma.

Applying North Carolina law, Judge Ableman of the asbestos court in Delaware has noted that "[n]either *Lohrmann* nor *Wilder* require evidence of specific instances or numbers of exposures, and the absence of such precise evidence is often understandable in mesothelioma cases due to the lengthy latency period of that disease." *Id.* at *See In re Asbestos Litig., Limited to Bowser, Gerald*, No. N10C-05-104 ASB, 2011 Del. Super. LEXIS 253, at *11 (Del. Super. Ct. June 3, 2011) (**Ex. P**). In *Bowser*, the plaintiff had identified the defendant's brakes as one of four brands he knew he had used throughout his career as an aviation mechanic, in part because

he had seen those brakes at his work sites, but he could not remember a specific instance in which he used the defendant's brand of brakes. *See id.* at *5. The court found this to constitute sufficient evidence of exposure to survive summary judgment under North Carolina law. Plaintiffs' evidence that Yates worked with Bendix brakes personally and on a daily basis at other jobs goes well-beyond the evidence found acceptable in *Bowser*.

Defendant simply has not met its burden to show that Bendix asbestos-containing brakes were not a substantial factor in the development of mesothelioma in Yates. As a result, it is not entitled to summary judgment.

## IV. CONCLUSION

For these reasons, the Yates ask this Court to deny Defendant's motion and for such other relief to which they may be justly entitled.

Respectfully submitted,

/s/ *Tiffany Dickenson*
Tiffany Dickenson
TX State Bar 24010264
Attorney for Plaintiff
Simon Greenstone Panatier Bartlett
3232 McKinney Ave, Ste 610
Dallas, TX 75204
214-276-7680
tdickenson@sgpblaw.com

Janet Ward Black
NC State Bar 12869
Attorney for Plaintiff
Ward Black Law
208 W. Wendover Ave.
Greensboro, NC 27401
336-333-2244
jwblack@wardblacklaw.com

ATTORNEYS FOR PLAINTIFF


**CERTIFICATE OF SERVICE**

      I hereby certify that on November 22, 2013 the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL INC.'S MOTION FOR SUMMARY JUDGMENT was electronically filed with the Clerk of Court for the Eastern District of North Carolina, using the CM/ECF system, which will send notification of such filing to the following:

**COUNSEL FOR AIR & LIQUID SYSTEMS CORP., ALFA LAVAL, INC., CRANE CO., ELLIOTT TURBO MACHINERY CO., WEIR VALVES & CONTROLS usa INC. (ATWOOD & MORRILL)**
William M. Starr
Tracy Tomlin
Nelson Mullins Riley & Scarborough, LLP
Bank of America Corporate Center
100 North Tryon Street, 42nd Floor
Charlotte, NC 28202
Phone: 704-417-3101 Direct Dial (Tracy Tomlin)
Fax: 704-417-3227 Dedicated Facsimile (Tracy Tomlin)
Phone: 704-417-3239 Direct Dial (Bill Starr)
Fax: 704-377-4814 (Main)
bill.starr@nelsonmullins.com
tracy.tomlin@nelsonmullins.com
jill.tucker@nelsonmullins.com
Dominique.werner@nelsonmullins.com

**COUNSEL FOR BORG WARNER**
J.A. Gardner, III
Jeremy Canipe
Hedrick Gardner Kincheloe & Garofalo, L.L.P.
6000 Fairview Road, Suite 1000 (28210)
P.O. Box 30397
Charlotte, NC 28230
Phone: 704-366-1101
Fax: 704-366-6181
jgardner@hedrickgardner.com
jcanipe@hedrickgardner.com
arorie@hedrickgardner.com

**COUNSEL FOR CBS CORPORATION, FOSTER WHEELER ENERGY CORPORATION, GENERAL ELECTRIC**
Jennifer M. Techman
Evert Weathersby Houff
3455 Peachtree Road, Suite 1550
Atlanta, GA 30326
Phone: 678-651-1200
Fax: 678-651-1201

JMTechman@EWHlaw.com

**COUNSEL FOR CROWN CORK & SEAL COMPANY, INC.**
Timothy W. Bouch
92 Broad Street
Post Office Box 59
Charleston, South Carolina 29402
Phone: 843-937-8811
Fax: 843-937-0606
tbouch@leathbouchlaw.com

**COUNSEL FOR DANA COMPANIES LLC**
Moffatt G. McDonald
W. David Conner
Scott E. Frick
Charles M. Sprinkle, III
Pauline Brown
Sarah S. Morrow
Haynsworth Sinkler Boyd
One North Main, 2nd Floor (29601)
P.O. Box 2048 (29602)
Greenville, SC 29601
Phone: 864-240-3200
Fax: 864-240-3300
mmcdonald@hsblawfirm.com
dconner@hsblawfirm.com
sfrick@hsblawfirm.com
csprinkle@hsblawfirm.com
pbrown@hsblawfirm.com
smorrow@hsblawfirm.com

**COUNSEL FOR FMC CORPORATION**
Peter A. Santos
Nexsen Pruet, PLLC
227 W. Trade Street, Suite 1550
Charlotte, NC 28202
Phone: 704-339-0304
Fax: 704-338-5377
psantos@nexsenpruet.com
cmatilainen@Nexsenpruet.com

**COUNSEL FOR FORD MOTOR COMPANY**
Kirk G. Warner
Christopher R. Kiger
Jessica F. Middlebrooks
Post Office Box 2611
2500 Wachovia Capitol Center
Raleigh, North Carolina 27602-2611
Phone: 919-821-1220
Fax: 919-821-6800
kwarner@smithlaw.com

ckiger@smithlaw.com
jmiddlebrooks@smithlaw.com

**COUNSEL FOR GENERAL ELECTRIC COMPANY**
Timothy Peck
Smith Moore Leatherwood LLP
300 North Greene Street, Suite 1400
Greensboro, NC 27401
Phone:  336-378-5307
Fax:  336-433-7471
tim.peck@smithmoorelaw.com

**COUNSEL FOR HONEYWELL INTERNATIONAL INC.**
H. Lee Davis, Jr.
Jason Walters
Davis & Hamrick, LLP
635 West Fourth Street
P.O. Box 20039
Winston-Salem, NC 27120-0039
Phone:  336-725-8385, ext 107
Fax:  336-723-8838
ldavis@davisandhamrick.com
jwalters@davisandhamrick.com


**COUNSEL FOR IMO INDUSTRIES, INC.**
Joshua H. Bennett
Richard V. Bennett
Bennett & Guthrie P.L.L.C.
1560 Westbrook Plaza Drive
Winston-Salem, North Carolina 27103
Phone:  336-765-3121
Fax:  336-765-8622
jbennett@bennett-guthrie.com
rbennett@bennett-guthrie.com


**COUNSEL FOR METROPOLITAN LIFE INSURANCE COMPANY**
 Keith E. Coltrain
Wall Templeton & Haldrup, P.A.
1001 Wade Avenue, Suite 423
Raleigh, NC 27605
Phone:  919-865-9500
Fax:  919-865-9501
keith.coltrain@walltempleton.com

                                            /s/ *Tiffany Dickenson*
                                            Tiffany Dickenson