UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:12-cv-752-FL

| | | |
|---|---|---|
| GRAHAM YATES and BECKY YATES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| AIR & LIQUID SYSTEMS | ) | |
| CORPORATION, successor by merger to | ) | |
| Buffalo Pumps, Inc., individually and as | ) | |
| successor-in-interest to The Delaval | ) | |
| Separator Company; ALFA LAVAL, | ) | |
| INC.; CBS CORPORATION, a Delaware | ) | |
| Corporation f/k/a Viacom, Inc. (sued as | ) | ORDER |
| successor by merger to CBS Corporation) | ) | |
| f/k/a Westinghouse Electric Corporation; | ) | |
| CRANE CO.; ELLIOTT TURBO | ) | |
| MACHINERY COMPANY, a/k/a Elliot | ) | |
| Company; FORD MOTOR COMPANY; | ) | |
| HONEYWELL INTERNATIONAL, INC., | ) | |
| successor-in-interest to Bendix | ) | |
| Corporation, f/k/a Allied-Signal, Inc.; | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY; and WEIR VALVES & | ) | |
| CONTROLS USA, INC., f/k/a Atwood & | ) | |
| Morrill, | ) | |
| | ) | |
| Defendants. | ) | |

This case, originally brought against 29 defendants where the nine above-captioned now

remain, once again returns to the court's attention with benefit of additional briefing ordered

February 21, 2014, on motions for summary judgment separately filed November 1, 2013, on

behalf of defendants Ford Motor Company ("Ford") (DE 171) and Honeywell International, Inc.

("Honeywell") (DE 173), along with plaintiffs' motions for reconsideration (DE 201, 203), upon which the court ordered further briefing July 9, 2014. The issues raised are ripe for consideration. For the reasons explained, the court will grant in part, and deny in part plaintiffs' motions for reconsideration. The court grants in part, and denies in part defendant Ford's and defendant Honeywell's motions for summary judgment.

## STATEMENT OF THE CASE

As noted in prior orders, plaintiffs, residents of Wake County, North Carolina, complain of personal injury and loss of consortium, where plaintiff Graham Yates was diagnosed with mesothelioma on August 13, 2012. Plaintiffs allege that his condition resulted from exposure to asbestos while employed as seaman, laborer, service station attendant, and automotive parts handler, and also from exposure experienced while performing maintenance on his home and personal vehicles.

Plaintiffs bring claims for negligence in putting asbestos or asbestos-containing products into the market (First Cause), breach of implied warranty (Second Cause), willful and wanton conduct (Third Cause), false representation/fraud (Fourth Cause), and failure to warn (Fifth Cause) against all defendants except for Metropolitan Life Insurance Company ("Metropolitan Life"), and a claim for conspiracy and punitive damages against Metropolitan Life (Sixth Cause). Plaintiffs seek actual and punitive damages, lost wages and special damages in excess of $75,000.

Pertinent to the instant motions, in an order on February 21, 2014, the court granted in part and denied in part summary judgment for defendants. Motions directed by defendants Ford and Honeywell against plaintiffs' claims premised on willful and wanton conduct (Third Cause), false representation/fraud (Fourth Cause), and failure to warn (Fifth Cause) were granted, where

2

the court concluded there existed no genuine issue of material fact. For reasons set forth more particularly therein, with respect to defendant Ford, the court held that plaintiffs had not provided sufficient evidence of any particular concealment or false representation meeting North Carolina's law of fraud (Fourth Cause). The court also granted defendant Ford's motion as to plaintiffs' claims for willful and wanton conduct (Third Cause), because plaintiffs had not submitted sufficient evidence that defendants knew or should have known the dangers of its products. Id. at 19. For this same reason, the court held that plaintiffs had failed to show a genuine issue of material fact regarding their failure to warn claim (Fifth Cause). The court also granted defendant Honeywell's motions on plaintiffs' claims for willful and wanton conduct (Third Cause), false representation/fraud (Fourth Cause) and failure to warn (Fifth Cause) because plaintiffs had not offered sufficient evidence of defendant Honeywell's knowledge.

The court held in abeyance decision on remaining parts of the motions, concerning plaintiffs' claims for negligently putting asbestos or asbestos-containing products into interstate commerce without warning (First Cause), and for breach of implied warranty regarding those products (Second Cause), and directed the parties to refine their arguments in address of some legal issues raised by the court. Both sides, however, exceeded the scope of the additional briefing ordered by the court in February.

Defendant Ford introduced new arguments, not previously briefed, for why the court should dismiss the First and Second Causes. Defendant Honeywell also introduced new arguments, as well as new evidence pertaining to causation and whether it should have known the risk posed by its products. Plaintiffs included in response a motion for reconsideration of the court's ruling that plaintiffs did not forecast sufficient evidence of defendants' knowledge, along with new evidence pertaining to what defendants "knew or should have known" about the dangers of their products.

Thereafter, in order entered July 9, 2014, the court allowed plaintiffs and defendant Honeywell to supplement the record with the new evidence presented. To promote parity, the court also afforded defendant Ford opportunity to file a further supplement to include new evidence, if any, bearing on the issue of whether it knew or should have known of the dangers that its products posed. Likewise, the court gave plaintiffs an opportunity to respond. The court also allowed that it would consider new arguments for summary judgment advanced by defendants based on breach of implied warranty (Second Cause), and gave plaintiffs an opportunity to respond to these new arguments. With respect to plaintiffs' motions for reconsideration, the court established a briefing schedule to permit defendants an opportunity to respond. Plaintiffs were required to seek leave in order to file any reply, which it did. The request was allowed.

## FACTUAL BACKGROUND

While the facts and evidence in this case have been summarized in earlier orders, the court finds it appropriate to restate these facts here for purposes of this order's clarity and comprehensiveness, and to account for arguments and evidence provided in the parties' supplemental filings. Relevant background material not only includes the actual events regarding plaintiff Graham Yates' use of the products at issue, viewed in the light most favorable to the plaintiff, and largely uncontested, but also the competing opinions of experts and certain other contradictory studies and evidence submitted by the parties. Disputes between the experts also are highlighted.

A. Ford

1. Factual Background

When defendant Ford began producing vehicles in the early 1900s, it manufactured and sold vehicles that incorporated friction components such as brake linings, brake pads, and clutch

4

facing that were composed of asbestos. In addition to selling vehicles with these friction components, defendant Ford sold the asbestos-containing friction components as replacement parts. The components used chrysotile asbestos fibers. Defendant Ford began to completely phase-out asbestos-containing brake products from its vehicles beginning in 1983, though the process took a number of years.

Plaintiff Graham Yates owned a Ford coupe from 1956 to 1960, and performed two personal brake replacement jobs on the vehicle, in 1956 and 1958. He also performed one brake job on his Ford Plymouth, sometime between 1960 and 1962. The garage where he made the replacements "wasn't a whole lot wider on either side than the car." (DE 175-1, at 155). He left the door of the garage open when he performed the job. When he replaced the brake, he would use a brake brush to clean out dust from the brake drum, which caused the air to fill with dust which he inhaled. Next, plaintiff Graham Yates would sand the new brakes, a process which would take "a few minutes" and which raised visible dust from the brake which he inhaled. (DE 175-2 at 14). Plaintiff Graham Yates purchased Ford brakes to make the replacements.

He admits that he cannot identify the manufacturer of the brake linings removed from the vehicle. Plaintiff Graham Yates also put manifold gaskets on his Ford vehicle in 1957, along with a water pump gasket. Removal of the gasket also created visible dust which plaintiff Graham Yates inhaled. However, he could not identify the manufacturer of the old gasket. He made the replacements with gaskets manufactured by Victor. After finishing the replacements, plaintiff Graham Yates swept the garage. He testified that this made the air dusty, and caused him to inhale more dust.

In addition, plaintiff Graham Yates worked at Sanders Motor Company ("Sanders"), an independent Ford dealership, for a total of six months between 1960 and 1961. He worked as a "parts clerk" (DE 175-1 at 160) for one month, five and a half days per week, and as a delivery

driver for five months, four to five days per week. As a parts clerk, plaintiff Graham Yates pulled parts for mechanics and customers, opening boxes to verify that they contained the right number of parts for the right products. It took "just seconds" to check these boxes. (DE 175-1 at 166). When plaintiff Graham Yates checked the boxes, it caused visible dust clouds to rise which he inhaled. On some occasions, plaintiff Graham Yates would remove the brakes from the box, which would cause dust residue to fall on his hands.

While at Sanders, Plaintiff Graham Yates would also enter the bays where mechanics performed maintenance work on vehicles to bring parts to the mechanics or to take a break from his duties as parts clerk. The mechanics' work included work on brakes. To perform the brake work, the mechanics used the same basic process as plaintiff Graham Yates himself used to change brakes. Visible dust was produced when the mechanics brushed the brake drum after removal of the old brakes, and also when they sanded the lining on the new brakes. Plaintiff Graham Yates inhaled that dust. These processes took "a couple of minutes" each. (DE 175-2 at 47-48). "On occasion," he helped sweep the bay after the brake work had been performed. (Id. at 49). Sweeping the dust would create visible dust which plaintiff Graham Yates inhaled.

Plaintiff Graham Yates' duties as delivery truck driver for Sanders also included pulling parts to put on the truck. He would check boxes to make sure they had the appropriate parts. In the course of an average day, this entailed opening a "dozen or two and maybe more" boxes of brakes. (DE 175-2 at 52). Plaintiff Graham Yates opened each box "at least three different times" on the course of this route. (Id. at 53). Opening the brake boxes created visible dust that he inhaled.

2. Experts

To demonstrate that the evidence is adequate to establish causation, plaintiffs largely rely on testimony of Dr. Eugene Mark ("Mark") (DE 184-20) and Steven M. Hays ("Hays") (DE

184-24; DE 184-25). Mark is a physician and pathologist at Massachusetts General Hospital, specializing in the diagnosis of patients with lung disease. He also is a pathology professor at Harvard Medical School, and has written a number of publications addressing mesothelioma and its causes. Hays is a partner and chairman of the board at Gobbell Hays Partners, Inc., which deals "with hazards in the built environment." (DE 184-24 at 76-77). He also serves as a seminar faculty member at Georgia Tech Research Institute and The Environmental Institute, lecturing on environmental topics including asbestos.

Both experts provide detailed testimony stating that activities such as replacing gaskets, handling brakes, opening brake boxes and sweeping could release significant levels of asbestos. Both also noted studies supporting that chrysotile asbestos as well as amphibole asbestos can cause mesothelioma.

Mark states that "asbestos is the only established cause of diffuse malignant mesothelioma in patients in the United States who have not received prior radiotherapy at the site of the tumor." (DE 184-20 at 2). He states that the "background" rate of atmospheric asbestos in United States cities is 0.00008 fibers per cubic centimeter. Mark opines that mesothelioma can be caused by low-levels of exposure to asbestos. He discusses studies which have found that cumulative intermittent exposures as low as 0.5 fibers per cubic centimeter resulted in a four-fold increase in the risk of mesothelioma. Mark further stated that "[i]t is generally accepted in the scientific community that there is no known occupational or para-occupational level of asbestos exposure, which has been shown not to contribute to the development of diffuse malignant mesothelioma," citing to a 1984 study by the National Research Council Committee. (DE 184-20 at 17). In addition, Mark opined that "the more someone is exposed to and thereby breathes asbestos, the greater his risk for developing diffuse malignant mesothelioma." (DE 184-20 at 11).

Mark relies upon another study which measured concentrations of asbestos fibers up to 0.67 fibers per cubic centimeter in air samples of persons opening brake shoe boxes. Other studies have found that a worker unpacking and repacking between four and 20 brake pads could be exposed to average concentrations up to 0.368 fibers per cubic centimeter, and that a worker unpacking and repacking between four and 20 brake shoes could be exposed to average concentrations up to 0.126 fibers per cubic centimeter. Mark also refers to studies showing that activities including sanding asbestos could release 2.2 fibers per cubic centimeter, and that sweeping thereafter could release asbestos concentrations above 1 fiber per cubic centimeter. He references a 1986 EPA document stating that "millions of asbestos fibers can be released during brake pad and clutch servicing . . . Asbestos released into the air lingers around a garage long after a brake job is done and can be breathed in by everyone inside a garage, including customers." (Id. at 6).

Based on such studies and others, and plaintiff Graham Yates' testimony, Mark opines that plaintiff Graham Yates's exposure to asbestos-containing Ford brakes was a "substantial contributing factor and a medical cause" in the development of his mesothelioma. (DE 184-20 at 29).

Hays opines that plaintiff Graham Yates worked around products that contained asbestos, that plaintiff Graham Yates was exposed to "significant airborne concentrations" whenever asbestos products or asbestos dust was disturbed, and that "airborne asbestos does not settle quickly from the air and can easily become re-entrained after it does settle." (DE 184-24 at 50-51). Hays also states that, "[g]ood industrial hygiene practices would have included warnings [regarding hazardous contaminants]." (Id. at 51). In addition, Hays provides a supplemental report which reviewed additional materials pertaining to the dustiness of asbestos-containing brake linings in brake packages. The report notes a 2003 study evaluating airborne asbestos

fiber concentrations during the opening of brake shoe boxes, and showing area concentrations that ranged from 0.04 to 0.18 fibers per cubic centimeter, with personal sample concentrations between 0.27 to 0.67 fibers per cubic centimeter. (Id. at 1). He concludes that asbestos fibers in brakes are releasable and respirable, and the opening of boxes produces asbestos exposure that increases risk of disease. (DE 184-25 at 2).

Plaintiffs' experts also comment on the scientific community's historical knowledge regarding the dangers of asbestos. Mark states that "[t]he link between exposure to asbestos and the development of fatal human disease has been known for well over 100 years." (Id. at 23). He outlines a number of reports linking asbestos to health hazards.

These articles, dating back to 1898, include reports on trades that involve toxic dusts and asbestos, although none of the articles prior to 1964 appear to specifically note the dangers of asbestos in the automotive industry or in brake replacement. He cites three publication from the 1930s by Merewether & Price which found scarring of the lungs among English workers in asbestos textiles, and notes that the hazards of asbestos could extend to work with finished products as well as raw asbestos. Mark specifically discusses a 1970 article by D.E. Hickish and K.L. Knight, both employees of the medical services department of defendant Ford's United Kingdom operations. (DE 184-20 at 7). The study notes atmospheric samples at levels of 1.12 and 1.42 fibers per cubic centimeter during car brake service, and atmospheric samples in dust clouds near cars at 1.71 and 3.62 fibers per cubic centimeter. (DE 184-18 at 1). Personal samples drawn from mechanics engaged in brake cleaning showed concentrations between 0.21 and 1.12 fibers per cubic centimeter. (Id. at 2). The study found that "[w]hile the standard [for safe exposure to asbestos] may be exceeded in the dust cloud during actual brake cleaning, the personal exposure of the operator studied was well below the standard." (Id. at 5). The same studies also examined truck servicing, showing general atmospheric concentrations away from

the immediate vicinity of the cleaning between 0.07 and 0.49 fibers per cubic centimeter (id. at 2), and personal concentrations between 0.08 and 7.09 fibers per cubic centimeter in mechanics engaged in truck brake service. (Id. at 5).

Hays states that "[t]he hazard of workplace dust, including asbestos, has been recognized since the 1930s." (184-24 at 7). He quotes from articles dating back to the 1930s concerning the dangers of dust and methods to reduce dust in industrial settings. (Id. at 7). Hays describes a 1968 study which noted that those working in the vicinity of asbestos work in the Navy could be exposed, even if they were not working directly with asbestos, and references other studies from the early 1970s showing that bystander exposure could be as high as the exposure to those actually doing the work with asbestos-containing materials. (Id. at 10-11). He states that "[t]he literature is flush with the hazard potential from asbestos dust." (Id. at 10). This statement is followed by a string-cite of authors and studies, dating back to 1937. Hays also states that complaints and health concerns regarding asbestos dust in brake lining boxes and packages date back to 1973, and that "[t]he literature is replete with asbestos exposure above background levels in the brake repair and maintenance industry," citing studies back to 1968. (Id. at 50). Hays' supplemental asbestos exposure report concludes that the brake manufacturing industry "was aware of the issues with brakes and their packaging in 1973." (DE 184-25 at 2).

As to historical understandings regarding the appropriate limits of asbestos exposure, Mark quotes from a 1964 article on the biological effects of asbestos, stating that "We do not believe there is any safe limit." (Id. at 17). Hays describes the development of regulations concerning asbestos. He states that the American Conference of Governmental Industrial Hygienists (ACGIH) in 1946 published a maximum allowable concentration of five million particles per cubic foot over eight hours. He notes that the first exposure standard promulgated by the Occupational Safety & Health Agency ("OSHA") for asbestos, set in 1971, was five

fibers per cubic centimeter of air. The current OSHA limits are 0.1 fibers per cubic centimeter for an eight hour time weighted average, and 1.0 fibers per cubic centimeter over a thirty minute sampling time.

Defendant Ford provides three expert reports on the subject of asbestos exposure, which it relies upon to argue that evidence concerning its products is insufficient to establish causation and survive summary judgment. Defendant Ford's experts point towards plaintiff Graham Yates's work in the U.S. Navy as the source of his illness, asserting that plaintiff Graham Yates suffered heavy exposure to a more-potent form of asbestos while employed in the Navy, while his brake-handling activities involved minimal contact with asbestos-containing products, and that evidence of asbestos exposure from its products fails to raise a genuine issue of material fact.

On defendant Ford's behalf, John Graham ("Graham") of the professional engineering firm Heflin & Williams, Inc. ("Heflin & Williams"), reviewed documents and testimony produced by plaintiffs, along with various documents related to shipbuilding materials and construction. (DE 175-3). Graham spent thirty-eight (38) years in "mostly waterfront production related endeavors," such as designing and building ships. (DE 175-3 at 2-3). He has worked part-time for Heflin & Williams for eight years, primarily in insurance claim investigations, planning overhaul work on ships, and work related to asbestos litigation involving materials and equipment used in naval and commercial ships and shipyards. Based on his review of the relevant discovery and shipbuilding documents, Graham opined that plaintiff Graham Yates was potentially exposed to asbestos-containing materials while serving in the U.S. Navy.

Fionna S. Mowat ("Mowat"), a scientist with the research and consulting company Exponent, who has worked in "exposure and risk assessment" for 15 years, (175-4 at 3), and has

authored several asbestos-related publications, also assessed the case on defendant Ford's behalf. She reviewed literature on the health effects and regulatory history of asbestos, along with studies of asbestos exposure in the automotive repair field, and together with litigation documents including plaintiffs' complaint, testimony, work history sheets, expert reports, medical records, and defendant Ford's document production and responses to interrogatories.

Mowat concludes that plaintiff Graham Yates's automotive work did not play a role in developing mesothelioma, that plaintiff Graham Yates was likely exposed to high levels of amphibole asbestos while serving in the Navy, and that defendant Ford made reasonable and responsible decisions regarding the use of chrysotile-containing brakes and in providing warnings regarding potential health effects. In addition, Mowat's report provides discussion concerning the historical knowledge of the dangers of asbestos.

Mowat states that "[i]n the early 1900s through 1929, isolated case reports began to appear in the scientific and medical literature suggesting a link between high levels of dust, including asbestos exposure, and lung disease or pneumoconiosis." (DE 175-4 at 16). She states that these case reports focused on "workers in textile mills, factories, and other manufacturing settings, where extremely high concentrations of asbestos occurred in the atmosphere when handling raw asbestos fibers and where factory conditions were extremely dusty." (Id.). She states that studies provided "little, if any, information regarding the concentrations to which workers were exposed, description of their job duties, smoking status, or evaluation of other potential exposures and diseases that may have contributed to their condition." (Id.).

Mowat acknowledges the 1930 Merewether and Price study as observing a link between the duration and amount of asbestos exposure in textile workers and the development of asbestos-related disease, but notes that the study "did not provide specific information regarding a dose-response relationship." (Id. at 17). According to Mowat, a subsequent 1938 study by the

12

U.S. Public Health Service determined that asbestosis could be avoided if exposures were kept below five million particles per cubic foot. While several studies between 1930 and 1959 reported on workers in asbestos-related industries, these focused on manufacturing workers in "very dirty and dusty factory settings." (Id.).

Mowat states that, prior to 1964, "no epidemiologic studies existed that linked mesothelioma with the use of end products containing asbestos." (Id. at 18). Not until 1975 did the issue of potential health effects in automotive repair workers as a result of work with brakes and clutches arise. (Id. at 19). Mowat asserts that "[w]hen the entire body of epidemiologic literature is evaluated – more than 20 studies in all – related to vehicle and brake mechanics, it is clear that work as an automobile mechanic does not incrase the risk of mesothelioma." (Id. at 20).

Gayla McCluskey ("McCluskey") of Global Environmental Health Services, Inc., provides an industrial hygiene report. (DE 175-5). McCluskey has worked in the field of industrial hygiene for over twenty years, including terms as President of the American Industrial Hygiene Association in 2002 and 2003, and President of the Academy of Industrial Hygiene in 2010 and 2011. McCluskey's reviewed the complaint, defendant Ford's answer, and plaintiff Graham Yates's work history sheets, social security administration statement, selected medical records, testimony and expert reports. McCluskey considers these materials in light of industrial hygiene, medical, epidemiological, and physical studies, including studies of asbestos exposure in the activities of "hands-on" and "bystander" brake work and opening brake boxes. Similar to defendant Ford's other experts, she concludes that plaintiff Graham Yates was likely exposed to amphibole asbestos during his service in the Navy, that amphibole forms of asbestos present in naval ships have higher potency factors than chrysotile forms of asbestos present in automotive

brake products, and that any exposure plaintiff Graham Yates received in the automotive industry would not have increased his risk of developing asbestos-related disease.

3.      Other Evidence Regarding Knowledge of Asbestos Risks

Aside from the literature cited by their experts, plaintiffs have presented other articles concerning the historical knowledge of the dangers of asbestos. Plaintiffs submit the 1970 Hickish and Knight article that Mark noted above (DE 184-18). They also provide two other articles from The Annals of Occupational Hygiene concerning methods of protection against asbestos, including one from Hickish and Knight, both published in 1970 and based on papers presented in 1969. (DE 184-19, 184-20).

In addition, plaintiffs present an article from 1976 on "Asbestos Exposure during Brake Lining Maintenance and Repair." (DE 184-15). The article notes that, since 1966, a "significant disease risk has been found associated with the inhalation of asbestos fibers in a number of occupational and environmental circumstances other than in asbestos mining, milling and manufacturing, where serious hazard was already known." (Id. at 1). Citing Hickish and Knight and other studies from 1970 and 1973, it goes on to state that "[m]ore recently, asbestos exposure has been suggested to occur during automotive brake lining repair and installation work, and measurable concentrations of asbestos fiber were observed in the work environment of workmen involved in these operations . . . With limited data available, however, uncertainty remained regarding the type and extent of asbestos exposure during this work." (Id.).

Finally, plaintiffs present evidence purported to demonstrate defendant Ford's actual knowledge of the dangers of asbestos. They present a series of articles published by the American Society of Mechanical Engineers ("ASME") from the 1930s, which deal generally with the dangers of industrial dusts, including asbestos dust, and recommend methods of testing and protecting workers. (DE 184-2). ASME membership lists from this time period include

14

Ford employees. (DE 184-26, 184-27). In addition, plaintiffs produce excerpts from a deposition of defendant Ford's representative, Lawrence Roslinski ("Roslinski"), taken in a California case in 2008. (DE 184-37). Roslinski testified that, by the mid-1960s at latest, defendant Ford knew that "[c]ertain types of asbestos in certain operations at certain concentrations could present a health hazard." (Id. at 27:23-25). Roslinski also testified that Ford medical employees might have had access to the Merewether and Price study from 1930 regarding silicosis and asbestos, also mentioned by plaintiff's expert Dr. Mark. (DE 184-37 at 62:15-18).

In supplemental briefing, plaintiffs provide additional evidence, including 1932 and 1935 publications from Merewether and Price, which include a statement that "[p]rocesses involving exposure to asbestos dust which are known to give rise to asbestosis or in which the conditions are such as to be liable to produce the disease, are . . . the sawing, grinding, and turning in the dry state of articles composed wholly or partly of asbestos such as motor car brake and clutch linings." (DE 201-1 at 4, 201-2 at 18). Plaintiffs submit additional excerpts from the Roslinski deposition, in which Roslinski stated that he did not have "any reason to dispute that Ford Motor Company knew in 1948 that asbestos in brakes was a potentially harmful compound." (DE 201-3 at 110:9-112:2). Plaintiffs also rely upon two additional articles from 1943 and 1948 which discuss the potential for asbestos to cause lung cancer.

As the court allowed, defendant Ford submitted additional evidence bearing on the issue of whether it knew or should have known the dangers of its products. This includes a July 2013 article written by Luda M. Kopelovich ("Kopelovich") regarding the history and evolution of warning labels for automotive friction products, which includes a historical survey of the knowledge of the dangers associated with asbestos. Kopelovich draws distinctions between the 1930s studies concerning "exposures in factories in which workers handled raw asbestos fibers,"

and the asbestos fibers in finished automotive brakes and clutches, which are "encapsulated" in the product and "prevented from becoming airborne even when manipulated." (DE 208-1 at 4).

The article notes increased federal regulation of asbestos in the 1950s and early 1960s, and takes note of studies in the late 1960s and early 1970s regarding asbestos-containing friction products. (Id.) The article provides that automotive manufacturers began placing warning labels on their brake and clutch products in the early 1970s. (Id. at 5). It further notes that there were no epidemiological studies conducted on asbestos-related diseases in brake mechanics prior to 1973. (Id. at 6).

Defendant Ford also relies on a 2004 article written by several researchers, which notes thirty (30) studies of workers in asbestos-related industries published between 1930 and 1959, eight of which discussed the potential exposures to diseases observed in friction product manufacturing workers. (DE 208-2 at 15). The article states that these studies "did show asbestosis among highly exposed worker populations; however, they often contained inadequate information to determine the asbestos exposures of these workers, and therefore were insufficient to estimate the dose-response relationships for friction product manufacturing workers and other manufacturing workers exposed to asbestos." (Id. at 18).

Defendant Ford notes that none of the studies in this period were of brake mechanics. (Id.). The article states that a 1963 study found an "elevated death rate for 'automobile mechanics and repairmen,' but suggested it could be due to exposure to automobile exhaust." (Id. at 31). The article states that none of these studies provided "a quantitative evaluation of asbestos exposure nor incidence of asbestosis," although they did provide evidence of asbestosis among highly exposed workers. (Id.). Last, defendant Ford provides a set of articles from the 1969 proceedings of the International Conference on Pneumoconiosis in Johannesburg.

16

Defendant Ford specifically highlights a conversation among experts at that meeting, in which two experts state that the asbestos fibers in brake linings do not pose a hazard.

Plaintiffs, in response, note that the Kopelovich article refers to a five million particles per cubic foot standard established by the Air Hygiene Foundation in 1941. (DE 211 at 2, citing DE 208-1 at 403). Plaintiffs submit an additional exhibit showing that defendant Ford became a member of this organization in 1946, after the organization's name changed to the Industrial Hygiene Foundation. (DE 211-1). Plaintiffs note that, as stated in Mark's report, literature from 1955 showed that visible dust creates exposures of at least five million particles per cubic foot. (DE 184-20).

B.      Honeywell

1.      Factual Background

The parties agree that the only Honeywell products at issue are Bendix brakes. Defendant Honeywell does not dispute plaintiffs' allegation that its predecessor-in-interest manufactured Bendix brakes containing asbestos. Plaintiff Graham Yates testified that he performed two brake changes with these brakes on personal vehicles: one in the late 1950s and the other between 1960-1962. He testified that he only changed the front brakes. As with the brake changes noted above, plaintiff Graham Yates cleaned the brake drum with a brush. It took "just a few minutes" to perform this task. (DE 174-1 at 22). When he made these changes, plaintiff Graham Yates testified that he saw dust come off of the old brakes, and that he "undoubtedly" inhaled the dust. (DE 174-1 at 20). He also testified that dust was created when he sanded the brake pads, and that he breathed that dust.

Between 1956 and 1957, plaintiff Graham Yates took a "trade-school type class" where he was assigned to Upchurch Esso and Daniels Esso gas stations as an attendant. (Id. at 69). He worked during the summer of 1956 and the following school year. During the summer, plaintiff

Graham Yates worked full-time, six days a week. He primarily worked at the Upchurch station, but would occasionally work at the Daniels station as a "secondary" option, in case, for example, the Upchurch station did not require his services on a given day. (DE 175-1 at 117). During the school year, the trade school course allowed him to leave school and work until around 10:00 p.m. His primary job duties entailed pumping gas, washing cars and windshields, putting oil in cars, and assisting the mechanics. He assisted mechanics in changing brakes by delivering parts to them. Both stations used Bendix brakes as new replacements.

Changing brakes caused brake dust to fly into the air, which plaintiff Graham Yates testified that he inhaled. He assisted in "[p]robably half" of the three to four brake changes that were performed each week at Upchurch Esso station. (DE 174-1 at 76). He was present at Daniels Esso in an average week during "probably half a dozen" brake jobs, though it is not clear whether he assisted in all of these. (DE 175-1 at 122). After the mechanics performed this brake work, the floor required sweeping. Although the mechanics were supposed to sweep, they "seldom did," so the task fell to plaintiff Graham Yates and another coworker. (DE 174-1 at 77). It would take twenty minutes to sweep each of the bays at the station.[1] Plaintiff Graham Yates testified that he inhaled more dust while sweeping.

In 1961 or 1962, plaintiff Graham Yates worked at the North Carolina Equipment Depot ("Equipment Depot"). The Equipment Depot stored and supplied vehicle parts and supplies, including brakes, to the North Carolina Department of Transportation. Plaintiff Graham Yates worked as a parts clerk at the Equipment Depot full-time, five days a week, for two years. As parts clerk, he had the task of pulling replacement parts off warehouse shelves and verifying that the appropriate number of items were in the boxes. This included boxes for brakes. When he opened the boxes, visible brake dust residue would enter the air and plaintiff Graham Yates

---

[1] It is unclear exactly how many bays were at the stations. Plaintiff Graham Yates testified that Upchurch had three bays and Daniels had only one, (DE 175-2 at 72), but also testified that "it was two bays." (Id. at 77).

inhaled it.  Plaintiff Graham Yates testified that the Equipment Depot dealt with Bendix brakes, although brakes from other manufacturers were also present.  He testified that he opened "dozens" of these brake boxes, though the deposition testimony is not clear whether this occurred on a daily, weekly or monthly basis.  (DE 174-1 at 84).  The box would be open for "seconds" each time that plaintiff Graham Yates checked it.  (DE 174-2 at 166-67).

2.      Experts

Plaintiffs rely on the same experts and literature discussed above regarding plaintiff Graham Yates' exposure to brakes used in defendant Ford's vehicles.  Based on the information and studies summarized above, plaintiffs' experts opine that activities such as changing and handling brakes, opening boxes, and sweeping could have exposed plaintiff Graham Yates to harmful levels of asbestos.  Mark specifically opines that plaintiff Graham Yates' exposure to asbestos-containing Bendix brakes was a substantial contributing factor to the development of mesothelioma.

Defendant Honeywell offers no expert testimony of its own.

3.      Other Evidence Regarding Knowledge of Asbestos Risks

Plaintiffs rely on the same evidence regarding the historical knowledge of the dangers of asbestos as noted above with respect to defendant Ford, with the exception of the Roslinski depositions or evidence of membership in ASME or the Industrial Hygiene Foundation.  Meanwhile, defendant Honeywell relies on a deposition of its corporate representative, Joel Cohen ("Cohen"), who testified that Bendix was "first put on notice" regarding the potential of asbestos to cause disease in 1968, when it received a letter from another asbestos company.  (DE 198-6, at 64).

**DISCUSSION**

A.     Standard of Review

        1.     Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard is met when "a reasonable jury can reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  On the other hand, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and summary judgment should be denied.  Id. at 489-90.

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but rather contemplates whether a genuine issue exists for trial.  Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).  In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  Nevertheless, such inferences "must still be within the range of reasonable probability" and the court should issue summary judgment "when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261 (4th Cir. 1958)).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment.  Anderson, 477 U.S. at 247–48.  Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248–49.

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

2.     Motion for Reconsideration

The court "retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003) (citing Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1469 (4th Cir. 1991)); cf. Fed. R. Civ. P. 54(b). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." Am. Canoe, 326 F.3d at 514. The power to grant reconsideration is committed to the district court's discretion. Id. at 515. Nevertheless, while not bound by Rule 60(b), the court may look to the general principles embodied therein. See Fayetteville Investors, 936 F.2d at 1470.

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. . . . Motions to reconsider are not proper where the motion merely asks the court to rethink what the Court had already thought through rightly or wrongly." DIRECTV, INC. v. Hart, 366 F. Supp. 2d 315, 317 (E.D.N.C. 2004). A motion to reconsider is appropriate where

> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court.

Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983); see also

Fed. Deposit Ins. Corp. v. Willetts, 882 F.Supp.2d 859, 867 (E.D.N.C. 2012) (motions to

reconsider are limited to the purpose of allowing the court to "correct manifest errors of law or

fact or to consider newly discovered evidence," and not to simply ask the court to re-evaluate its

decision).

B.      Analysis

1.      Breach of Implied Warranty (Second Cause) – Both Defendants

At the outset, plaintiffs inform the court that they have decided not to oppose defendants' motion

for summary judgment on their claim for breach of implied warranty (Second Cause). Actions

for breach of implied warranty of merchantability are defined by the North Carolina Uniform

Commercial Code. N.C. Gen. Stat. § 25-2-314.

> To establish a breach of implied warranty of merchantability under the statute, a
> plaintiff must prove (1) that the goods bought and sold were subject to an implied
> warranty of merchantability; (2) that the goods did not comply with the warranty
> in that the goods were defective at the time of sale; (3) that his injury was due to
> the defective nature of the goods; and (4) that damages were suffered as a result.

DeWitt v. Eveready Battery Co., 355 N.C. 672, 682-83 (2002).

North Carolina's Products Liability Act, N.C. Gen. Stat. 99B-1 et seq., further provides

that certain parties "may bring a product liability action directly against the manufacturer of the

product involved for breach of implied warranty; and the lack of privity of contract shall not be

grounds for the dismissal of such an action." N.C. Gen. Stat. § 99B-2(b).

Defendants argue that plaintiffs failed to provide evidence that any such implied

warranty of merchantability arose. This satisfied defendants' burdens of demonstrating the

absence of any genuine issue of material fact, and through failure to oppose this argument

plaintiffs have not carried their burden to produce specific evidence of such a genuine issue. See

Celotex, 477 U.S. at 323; Matsushita, 475 U.S. at 586-87. Accordingly, the court grants

summary judgment as to plaintiffs' claim for breach of implied warranty (Second Cause) on behalf of defendants Ford and Honeywell.

Remaining before the court are defendants' motions for summary judgment regarding claims for negligence in putting asbestos-containing products into the market (First Cause), and plaintiffs' motion for reconsideration of the court's February 2014 Order regarding whether defendants "knew or should have known" that their products posed a danger, and regarding plaintiffs' failure to submit sufficient evidence to support their claim for willful and wanton conduct (Third Cause). The court addresses these motions with respect to each defendant below.

2.      Ford

a.      Motion for Reconsideration

Plaintiffs ask the court to reconsider its earlier ruling on the issue of whether defendant Ford knew or should have known about the dangers of its product, which was the basis of the court's decision to grant summary judgment on plaintiffs' claim for failure to warn (Fifth Cause). Plaintiffs further argue that their supplemental evidence raises genuine issues regarding defendant Ford's willful and wanton conduct (Third Cause), and request the court reconsider that ruling as well.[2] The court addresses the motion for reconsideration with respect to each of these claims in turn.

i.      Failure to Warn (Fifth Cause)

The court will reconsider its ruling that plaintiffs did not forecast sufficient evidence that defendant Ford "knew or should have known" of the hazards of its asbestos products. Upon review of the record, the court acknowledges that the issue of whether the defendant Ford "knew

---

[2] Plaintiffs' motion for reconsideration and supplemental briefing does not specifically offer argument or evidence for reconsideration regarding their claim for false representation or fraud (Fourth Cause). The court granted summary judgment on this claim with respect to defendant Ford because plaintiffs had failed to make a showing of any false representation or concealment of a material fact meeting the North Carolina law of fraud. With no further argument on this matter, the court's ruling for defendant Ford on this claim remains.

or should have known" about the dangers of asbestos was not squarely presented in the original briefings.

In moving for summary judgment on plaintiffs' pursuit of punitive damages, defendant Ford argued that the evidence did "not support the position that [a causal relationship between brake dust and asbestos-related illness] was known to exist in 1961, or that Ford committed actual fraud, malice, or willful or wanton conduct in connection with the manufacture or distribution of any products Mr. Yates purportedly worked with or around." (DE 175 at 11). In its reply, defendant Ford argued that plaintiffs' arguments for willful and wanton conduct "appear to be directed more toward a failure to warn claim," and further argued that "[t]he evidence cited by Plaintiffs in support of their punitive damages claim falls well short of even remotely satisfying the elements [of a failure to warn claim] under 99B [North Carolina's Products Liability Act, N.C. Gen. Stat. § 99B-1, *et seq.*]." (DE 187 at 7 n. 8).

As noted, the court held, on the basis of the record then existing, that plaintiffs had failed to provide sufficient evidence of defendant Ford's knowledge of the dangers of its product to show willful and wanton conduct (Third Cause). Considering this same evidence, the court found plaintiff's failure to warn claim (Fifth Cause) must fail.

Upon review, the court agrees with plaintiffs that this decision to grant summary judgment on the failure to warn claim was "outside the adversarial issues presented to the Court by the parties." Above the Belt, 99 F.R.D. at 101. Defendant Ford only tangentially argued that plaintiffs' evidence failed to show that it "should have known" that the brakes posed a substantial risk, and plaintiffs did not have an opportunity to respond to this argument. Reconsideration is thus appropriate.

To show a failure to warn, a plaintiff must prove that 1) the manufacturer acted unreasonably in failing to provide a warning or instruction, 2) the failure to warn or instruct was

a proximate cause of harm, and 3) either (a) the failure to warn or instruct created an unreasonably dangerous condition that the manufacturer *knew or should have known* posed a substantial risk of harm to a foreseeable plaintiff, or (b) after the product left the manufacturer's control, the manufacturer *became aware or should have become aware* that the product posed a substantial risk of harm to foreseeable plaintiffs, and the manufacturer failed to take reasonable steps to provide adequate warnings or instructions. N.C. Gen. Stat. § 99B-5(a) (emphasis added).

In Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276 (4th Cir. 1993), the Fourth Circuit addressed a challenge to certain asbestos regulations issued in 1972 by OSHA, offered by the defendant to show that no duty to warn preceded this date and to show that it was issuing its own warnings even before OSHA required them. Id. at 280. In order to address the challenge, the court stated that it

> [F]irst must determine whether North Carolina accepts state-of-the-art testimony in products liability cases to show the standard of care applicable. Because state-of-the-art evidence helps shape the duty owed by the alleged tortfeasor, we must insure . . . that North Carolina law would allow[ ] such testimony to establish a duty in an action alleging products liability. The North Carolina Court of Appeals has indicated that such evidence is admissible.

Id. at 280-81 (citing Rowan Cnty. Bd. of Educ. v. United States Gypsum Co., 103 N.C. App. 288, 308 (1991)).[3] In Horne, the court further defined "state of the art" as follows:

> State of the art represents all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available. State of the art includes the element of time: What is known and when was this knowledge available.

---

[3] The court's jurisdiction in this proposed class action is based on district courts' original jurisdiction over actions involving diversity of citizenship with an amount in controversy exceeding $75,000. 28 U.S.C. § 1332(a). Federal courts sitting in diversity apply federal procedural law and state substantive law. Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n.3 (4th Cir. 2013). Thus, North Carolina law applies.

Horne, 4 F.3d at 281 (quoting Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1164 (4th Cir.1986)) (quotation marks omitted). The court went on to hold that the regulations were properly admitted as state-of-the-art evidence. Id.

In a more recent case, Williams v. CSX Transp., Inc., 176 N.C. App. 330 (2006), the North Carolina Court of Appeals held that evidence including medical literature concerning the danger of asbestos published in the 1960s could permit a jury to infer that the defendant had knowledge of the harm from asbestos. Id. at 341-42. Although that case applied the Federal Employers' Liability Act, rather than North Carolina law, it is nonetheless instructive in that it applied a standard similar to North Carolina's failure to warn law, where an employer could not "be held liable for an employee's injury if it had no reasonable way of knowing about the hazard that caused the injury." Id. at 341.[4]

In Lohrmann, a case applying Maryland law, the court described the relevance of "state of the art" evidence as follows:

> State of the art in the present case would determine the manufacturer's duty to warn of the danger of asbestos to persons such as Lohrmann, who did not work directly with asbestos, but worked in close proximity to insulators using asbestos-containing products. The question was when the state of the art included knowledge that people such as Lohrmann were at risk because they were working near insulators and others using asbestos-containing products.

Lohrmann, 782 F.2d at 1164.

In this case, similarly, the question is when the "state of the art," as defined above, included knowledge that those such as plaintiff Graham Yates were at risk from defendant's

---

[4] Numerous other jurisdictions have also found "state of the art" evidence relevant to whether a manufacturer should know about dangers associated with its product, and have held manufacturers "to the knowledge and skill of an expert," whereby the manufacturer has a duty "to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1089-90 (5th Cir. 1973); see also George v. Celotex Corp., 914 F.2d 26, 28 (2nd Cir. 1990); O'Banion v. Owens-Corning Fiberglas Corp., 968 F.2d 1011, 1016 (10th Cir. 1992); Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 413 (D. Md. 2001). Plaintiffs urge the court to similarly adopt the "expert" standard here, but admit that no North Carolina case is on point. While allowing that state of the art may inform the question of whether a manufacturer "should have known" the dangers posed by its product, the court does not find it necessary, at this stage and on the arguments presented, to go so far as to hold that the "expert" standard applies in North Carolina.

26

asbestos-containing product. Still, even when the scope turns beyond defendant Ford's knowledge to consideration of "all of the available knowledge" in existence at the time of plaintiff Graham Yates' exposure, the question of whether the state of the art included such knowledge is a challenging one, to say the least, and clear precedent does not appear to exist.

Traditional asbestos litigation has involved products such as insulation. See Horne, 4 F. 3d at 278-79; George v. Celotex Corp., 914 F.2d 26, 27 (2nd Cir. 1990); Lohrmann, 782 F.2d at 1158; Borel v. Fiberboard Paper Prods. Corp., 493 F.2d 1076, 1081-82 (5th Cir. 1973). The asbestos from such materials may be rendered airborne more easily, and the danger may be more apparent. Plaintiffs' expert Hays notes studies of insulation materials showing up to 3,021 fibers per cubic centimeter in the general atmosphere during pipe and machinery insulation removal and installation, exponentially above the concentrations of 0.18 fibers per cubic centimeter he notes during the opening of brake shoe boxes. Insulation products are commonly associated with amphibole asbestos, rather than the chrysotile asbestos in defendant Ford's brake products. Plaintiffs do not contest that amphibole fibers are a less-potent form.

Courts have acknowledged that "all asbestos-containing products cannot be lumped together in determining their dangerousness." Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1145 (5th Cir. 1985) ("Proof that asbestos *insulation* products are dangerous or defective does not satisfy the burden of proving that products used for other purposes, such as asbestos textiles with encapsulated asbestos fibers, are dangerous."); Mayor and City Council of Baltimore v. Utica Mut. Ins. Co., 145 Md. Ct. Spec. App. 256, 267 n. 5 (1998).

The distinction between the dangers of asbestos-containing insulation products and asbestos-containing brake products has been specifically noted in case law. Borg-Warner Corp. v. Flores, 232 S.W. 3d 765, 773-74 (Tex. 2007) (holding that "proof of causation may differ depending on the product at issue," distinguishing thermal insulation products from brake pads,

and finding plaintiff's evidence of causation from the latter to be insufficient.). In Lohrmann, the court observed that the "[t]he state of the art as it relates to the health of persons exposed to asbestos products differs considerably for asbestos plant workers dealing with raw asbestos and for persons working in the vicinity of asbestos products." Lohrmann, 782 F.2d at 1161.

The state of the art may not have indicated the danger to all persons regarding all uses of all asbestos at the same time. See Bartel v. John Crane Inc., 316 F. Supp. 2d 603, 610 (N.D. Ohio 2004) (bench trial finding that manufacturer of gaskets and packing had no duty to warn because no literature suggested that these products might present a health hazard to humans until 1999, five years after plaintiff's career ended.); see also Scott v. Ford Motor Co., 224 Cal. App. 4th 1492, 1496-97 (2014) ("This general knowledge [regarding the dangers of asbestos exposure between 1920 and 1960] did not necessarily translate to the vehicle service industry, however, because the type of asbestos fiber used in the manufacture of auto parts is far less potent in causing harm than other industrial types of asbestos.") (but declining to address whether defendant Ford should be deemed to have sufficient knowledge of the risks because Ford had not timely raised the argument).

However, on the record presented, in the light most favorable to the plaintiffs, this court cannot find there is no genuine issue of material fact. The court reflects on cases finding that state of the art regarding knowledge about the general dangers of asbestos, along with evidence that such knowledge was available to defendants through membership in trade organizations or otherwise, may show that a party responsible for exposing a plaintiff to asbestos products should have known the risk that those products presented. In Williams, 176 N.C. App. 330 (2006), a railroad employee brought a failure to warn action against his employer, alleging that it regularly exposed him to asbestos dust while working around craftsmen who manipulated asbestos containing materials and while working around construction, repair, and demolition of buildings

containing asbestos siding.  Id. at 333-34.  The employee worked from 1962 until 1999.  Id. at 333.

The court held that medical literature dating from the 1960s that asbestos caused harm, defendant's membership in an organization whose publications and annual meeting minutes acknowledged the danger of asbestos exposure beginning in 1937, and documents dating from the 1970s about the dangers of asbestos permitted a jury inference that defendant had knowledge of the harm from asbestos, so as to hold defendant liable for employee's mesothelioma.  Id. at 341-42.

In Quirin v. Lorillard Tobacco Co., No. 13 C 2633, 2014 WL 585090  (N.D. Ill. Feb. 14, 2014), the court denied a motion for summary judgment on a plaintiff's failure to warn claim brought against a valve manufacturer whose products required asbestos-containing gaskets and packing material.  Id. at *1, *6.  The state of the art evidence included that an engineer for the defendant was a member of ASME and that ASME had published a trade magazine containing articles dealing with asbestos-related diseases; a doctor associated with defendant was a member of an organization which had informed its members about the dangers of asbestos; defendant may have been a member of another organization which published reports noting the possibility of asbestos to cause cancer; and defendant advertised in magazines which discussed the risks of asbestos.  Id. at *4.

The court held that a reasonable jury could conclude that the manufacturer should have known the risks of exposure resulting from the use of the asbestos-containing materials in conjunction with its valves by the time of plaintiff's naval service from 1953-1957, "given its position in the industry and membership in various organizations."  Id. at *9.  See also Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 194-96 (1992) (holding that state of the art literature

was sufficient by 1942, based in part on numerous articles dealing with the health risks of asbestos, to impose duty to warn on manufacturer of asbestos products).

Using such cases as guideposts, the record here demonstrates a genuine issue of material fact as to whether defendant Ford should have known of the dangers posed by its product, and thus had a duty to warn, given the state of the art concerning the dangers of asbestos. There is no dispute that asbestos had been identified as a potentially harmful substance by the 1930s. The Merewether and Price studies noting that asbestos-related diseases could result from the "sawing, grinding, and turning in the dry state of articles composed wholly or partly of asbestos such as motor car brake and clutch linings" had existed for over two decades by the time of plaintiff Graham Yates' work at Sanders. (DE 201-1 at 4, 201-2 at at 18).

Furthermore, one of the articles submitted by defendant Ford itself stated that studies of asbestos manufacturing workers, including friction product manufacturing workers, showed asbestos-related disease "among highly exposed worker populations" in the decades leading up to plaintiff Graham Yates' exposure. (DE 208-2 at 18). Roslinski testified that he "would expect" defendant Ford's industrial hygiene group knew as early as 1948 that asbestos in brake linings was "potentially harmful." (DE 201-3 at 111-12). Literature from 1955 showed that visible dust created asbestos exposures of at least five million particles per cubic foot, above the standard for safety set by the Industrial Hygiene Foundation of which defendant Ford was a member. Defendant Ford was also a member of ASME, which disseminated literature regarding the hazards of asbestos.

Plaintiff Graham Yates testified that his work on personal vehicles and at Sanders exposed him to visible dust clouds from brake boxes. Based on the evidence submitted, there is a genuine issue of material fact over whether defendant Ford should have made the connection between the long-standing knowledge of the dangers of asbestos, studies regarding the release of

30

asbestos from brakes, the visible dust clouds emitted during brake replacements and when opening brake boxes, and diseases such as those contracted by plaintiff Graham Yates.

Defendant Ford's supplemental briefing on this motion for reconsideration suggests that the Merewether and Price articles submitted by plaintiffs should be discounted because they discuss asbestosis, which is not a condition that plaintiff Graham Yates is alleged to have. However,

> All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.

Hart v. Curry, 238 N.C. 448, 449 (1953) (quotation marks omitted). Given that the state of the art indicated a potential connection between the dust from brake asbestos and disease, defendant Ford need not have foreseen the precise form of disease that afflicted plaintiff for a jury to hold it liable. See also Balbos, 326 Md. at 197 (distinction between mesothelioma and asbestosis would not preclude liability, when "the jury could find that [defendant] knew or should have known of the hazard of lung disease produced by inhaling asbestos fibers."). The court thus finds a genuine issue of material fact exists as to whether defendant Ford should have known that the asbestos-containing brakes in its vehicles posed a substantial risk of foreseeable harm. Summary judgment should not have been granted against plaintiffs' "failure to warn" claim (Fifth Cause) on this ground, and in this respect plaintiffs' motion is ALLOWED.

ii.     Willful and Wanton Conduct (Third Cause)

By contrast, regarding plaintiffs' motion for reconsideration with respect to plaintiffs' claim seeking punitive damages for willful and wanton conduct (Third Cause), the court will maintain its earlier ruling. North Carolina's punitive damages statute defines "willful or wanton conduct" as "the conscious and intentional disregard of and indifference to the rights and safety

31

of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. § 1D-5(7). To recover punitive damages, a plaintiff must prove willful or wanton conduct by "clear and convincing evidence." N.C. Gen. Stat. § 1D-15(b). Case law outside of the punitive damages statute has defined this conduct in similar terms. "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others . . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." Yancey v. Lea, 354 N.C. 48, 52-53 (2001). "Willful negligence" has been defined as an act

> done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. The true conception of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.

Id. (quotation marks omitted). "While ordinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act . . . wanton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results." Akzona, Inc. v. S. Ry. Co., 314 N.C. 488, 496 (1985).

In Schenk v. HNA Holdings, Inc., 170 N.C. App. 555 (2005), the North Carolina Court of Appeals affirmed the grant of a defendant's motion for directed verdict on punitive damages for injuries sustained through occupational exposure to asbestos. In that case, one of the defendant's engineers destroyed a memorandum regarding concerns with insulation removal practices. Id. at 558, 560. The court held that plaintiffs had not met the "clear and convincing evidence" standard because the engineer had simply asked to be advised of improper handling

verbally rather than in writing; plaintiffs had not offered evidence that he was an officer, director or manager;[5] and the underlying conduct alleged in the memorandum was not necessarily connected to asbestos exposure.  Id. at 560-61.  The other evidence for "willful and wanton conduct" included that the defendant used a non-recommended procedure for removing asbestos which violated certain OSHA regulations.  Id. at 558, 561.  The court held this violation might show defendant's negligence, but failed to provide sufficient evidence of "willful and wanton conduct."  Id. at 561.  Finally, the court also noted that defendant posted general federal safety regulations for employees to read, made dust masks available to maintenance workers, and provided training for asbestos removal.  Id. at 562.  Schenk considered claims for willful and wanton conduct based on evidence that the defendants actually knew of a probable danger.

By comparison, the evidence concerning what defendant Ford knew about the dangers of asbestos is not sufficient to show "willful and wanton" conduct, even without applying the "clear and convincing" standard of evidence necessary for punitive damages.  To show "willful and wanton conduct" in the original briefing on summary judgment, plaintiffs directed the court to consider evidence regarding the membership of certain of defendant Ford's employees, including founder and President Henry Ford, in ASME during the 1930s.  Plaintiffs explained that ASME provided a series of articles in the 1930s warning of the dangers that industrial dusts could pose for lungs, and referred to asbestos.  Plaintiffs failed to produce evidence that any of defendant Ford's employees actually understood from these articles that the asbestos included in its brakes was reasonably likely to pose a harm, or that any of the employees even read these articles prior to plaintiff Graham Yates' exposures, or were otherwise aware of their findings or

---

[5]  The punitive damages statute provides that, in a case involving a corporation, punitive damages may only be awarded if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages."  N.C. Gen. Stat. § 1D-15(c).

recommendations.  It is too speculative to find "conscious and intentional disregard" for safety from these articles alone.

The additional evidence provided on plaintiffs' motion for reconsideration fails to remedy underlying deficiencies.  While the 1932 and 1935 Merewether and Price studies do refer to the hazards of asbestos to workers who deal with sawing, grinding or turning motor car brakes, plaintiffs still have failed to point to record evidence that defendant Ford was actually aware of the information communicated by these statements, both of which are single sentences excerpted from British Home Office publications that did not focus on the automotive industry. Plaintiffs also cite to additional excerpts from the Roslinski deposition to argue that defendant Ford "acknowledged that the first adverse health effects from asbestos were reported in 1907." (DE 201 at 18-19).  Again, this is only a general reference to the dangers of asbestos, and does not show that defendant Ford was aware of a danger posed by its own product, or the conditions in which that product would be dangerous.

Plaintiffs cite to another excerpt from the Roslinski deposition to assert that defendant Ford "was aware that the link between asbestos and asbestosis was reported in Merewether & Price in 1930." (DE 201 at 19).   In addition to being another broad statement regarding the dangers of asbestos as a general matter, the cited testimony does not establish when defendant Ford became aware of this link.  Plaintiffs note that defendant Ford had an industrial hygiene department responsible for observing "potential hazards in the workplace," (DE 201 at 19), but fail to direct the court to any evidence demonstrating that the department was actually aware of the dangers of Ford brake products to persons such as plaintiff Graham Yates.  Roslinski stated that defendant Ford knew "by the middle 1960s at the latest" that "[c]ertain types of asbestos in certain operations at certain concentrations could present a health hazard," (DE 184-37 at 52:23-25) and that defendant Ford knew in 1948 that asbestos in brake linings "was a potentially

harmful compound." (DE 201-3 at 110:9-112:2). These broad statements about potential harms under undefined conditions fail to demonstrate that defendant Ford "knew the probable consequences" regarding the dangers of using brakes containing asbestos. <u>Akzona</u>, 314 N.C. at 496.

Finally, plaintiffs note that defendant Ford was a member of a group, the Industrial Hygiene Foundation, which recognized a maximum allowable concentration of asbestos exposure of five million parts per cubic foot. They also point out that a 1955 study showed that visible dust created exposures with at least this level of concentration. The only information about this 1955 article appears in a passing reference made in Mark's declaration, stating that "[t]he literature shows that visible dust creates exposures of at least 5 million particles per cubic foot." (DE 184-20 at 6). No details are provided regarding the circumstances these "visible dust" clouds were created, i.e. whether the dust arose from raw asbestos, asbestos insulation, or some other product, and plaintiffs have not shown that defendant Ford was aware of the information regarding the potential dangers of visible dust from the brake products it used.

There is no evidence of internal communications showing concealment or misrepresentation of facts regarding the dangers of asbestos in the brakes used by defendant Ford's vehicles. Meanwhile, some of plaintiffs' own evidence indicates a lack of knowledge regarding the dangers of asbestos in brakes during this time period. Plaintiffs' expert, Hays, concludes that "the brake manufacturing industry was aware of the issues with brakes and their packaging in 1973" – over a decade after plaintiff Graham Yates' exposure. (DE 184-25 at 2). One of the articles submitted by plaintiffs notes that, even in the early 1970s, "uncertainty remained regarding the type and extent of asbestos exposure during [automotive brake lining repair and installation] work." (DE 184-15 at 1).

Plaintiffs' evidence remains insufficient to create a genuine issue of material fact that defendant Ford acted with "conscious and intentional disregard of and indifference to the rights and safety of others," whether or not it is analyzed under the "clear and convincing" standard of evidence for punitive damages claims. The court thus maintains its earlier ruling that summary judgment should be granted against plaintiffs' claim for willful and wanton conduct (Third Cause). In this part, plaintiffs motion is DENIED.

b.      Motion for Summary Judgment

Two claims remain to be considered on summary judgment: plaintiffs' claim for negligently putting asbestos or asbestos-containing products into the market without warning (First Cause); and the failure to warn claim (Fifth Cause), revived by the court's decision to reconsider its earlier decision. As noted above, one element of a failure to warn claim is that a plaintiff prove the failure to warn or instruct was a proximate cause of harm. N.C. Gen. Stat. § 99B-5(a). In addition, the essential elements of a products liability action predicated on negligence are

> (1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach, and; (4) loss because of the injury.

Driggers v. Sofamor, S.N.C., 44 F. Supp. 2d 760, 766 (M.D.N.C. 1998) (citing Nicholson v. Am. Safety Utility Corp., 124 N.C. App. 59, 64-65 (1996)).

Defendant Ford argues that the evidence for these two claims fails on the element of causation.

In the case of Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712 (4th Cir. 1995), the court held that North Carolina requires that

> [T]he plaintiff in a personal injury asbestos case must prove more than a casual or minimum contact with the product containing asbestos in order to hold the manufacturer of that product liable. Instead, the plaintiff must present evidence

36

of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.

Id. at 716 (quoting Lohrmann, 782 F.2d 1156, 1162-63) (quotation marks omitted). The Jones test, adopted from Lohrmann, is also known as the "frequency, regularity and proximity" test. Lohrmann, 782 F.2d at 1162.

Plaintiff Graham Yates' testimony supports that he was exposed to asbestos-containing brakes in Ford vehicles on a regular basis as a delivery driver at Sanders. This work occurred over a period of five months, which is a sufficiently extended time-frame, and the exposures occurred repeatedly each day over this period. This evidence is sufficient to meet the Jones/Lohrmann test. See Rotondo v. Keene Corp., 956 F. 2d 436, 439, 442 (3rd Cir. 1992) (holding that evidence that plaintiff worked in proximity to asbestos product at least two days a week over three to four months during a summer was sufficient evidence to meet a test for "frequency of the use of the product and the regularity of the plaintiff's employment in proximity thereto.").

In so holding, the court takes note that Jones and Lohrmann described the "frequency, regularity and proximity" test as a means to assure that plaintiff had proven "more than a casual or minimum contact with the product containing asbestos in order to hold the manufacturer of that product liable." Jones,, 69 F.3d at 716 (quoting Lohrmann, 782 F.2d at 1162) (quotation marks omitted). Plaintiff Graham Yates' testimony concerning daily exposures, for multiple times each day, to visible dust from an asbestos-containing product over a five month period, demonstrates that his exposures rose above "casual or minimum contact." Id.

Defendant Ford has attempted to quantify plaintiff Graham Yates' exposure. Accepting plaintiffs' statements concerning the number of times plaintiff Graham Yates opened brake boxes as a driver (48-100 times each week), noting his testimony that it only required "a few

seconds" to open and check the brake boxes, and assuming that each brake box was opened for three seconds, defendant Ford calculates that plaintiff Graham Yates opened brake boxes between 1,000 and 2,000 times over the five-month period, for a total exposure time of less than two hours. Defendant Ford notes that, in Lohrmann, the court found the plaintiff's evidence of exposure insufficient when he was exposed to asbestos dust from a pipe covering product on 10 to 15 occasions between one and eight hours of duration. Lohrmann, 782 F.2d at 1163.

However, as the court discussed in its February 21, 2014 Order, the Lohrmann case involved a mere 15 instances of exposure over the plaintiff's 39-year career. Id. at 1163. Over this time period, plaintiff testified he was exposed "on an almost daily basis" to other asbestos products. Id. In addition, in Lohrmann the plaintiff's own medical expert testified that even 30 days of exposure was "insignificant as a causal factor in producing the plaintiff's disease." Id. at 1163. The court did not articulate a total time of exposure test, but rather a test of exposure on a "regular basis over some extended period of time." Id. at 1162-63.

Here, evidence does not establish consensus as to any such minimum threshold level of exposure to asbestos necessary to cause disease, as the evidence provided in Lohrmann. Furthermore, defendant Ford's calculations of exposure time may not be accurate, in light of the expert reports that asbestos dust may linger in the air for significant periods of time after being unsettled. (DE 183-16 at 9) (referencing studies showing that "[a]sbestos fibers are very small and possess aerodynamic qualities such that the fibers, once released to the air, may remain suspended for hours, and hence remain in the breathing zone of workers and bystanders . . . Fibers may eventually settle onto surfaces in the work area . . . and can be resuspended into the air when the surfaces onto which they settled are disturbed.").

Defendant Ford argues that plaintiffs have not provided evidence regarding the composition of the dust in the brake boxes. However, Mark's report states that studies show that

38

asbestos brakes may "release respirable asbestos fibers during the opening and handling of brake boxes." (DE 184-20 at 5). He also references findings from the Friction Materials Standards Institute and other studies showing that customer inspection of brake boxes could show airborne fiber concentrations of asbestos thousands of times above the background rate for cities in the United States. (Id. at 5-6). Hays cites to these and other studies regarding the opening of brake boxes, and specifically opines that the opening of brake boxes could produce asbestos exposure that would increase risk of asbestos-related disease. From these opinions and studies, a jury may reasonably infer that the dust arising from the brake boxes contained harmful concentrations of asbestos. See Caruolo v. John Crane, Inc., 226 F.3d 46, 52-53 (2nd Cir. 2000) (testimony from plaintiffs' expert witnesses that visible dust from gaskets or packing would likely contain hazardous levels of asbestos, along with articles discussing hazardous levels of asbestos fibers released involving gaskets and packing, was adequate for jury to find that dust emanating from defendant's products contained hazardous levels of asbestos.).

Defendant Ford argues that the brakes used in its vehicles were composed of chrysotile asbestos, which it asserts to be less toxic than other forms of asbestos. Nevertheless, while its experts testify to the contrary, plaintiffs' experts have reported that all types of asbestos can cause mesothelioma. A genuine issue exists for the jury to determine regarding the potential of the chrysotile asbestos components to cause plaintiff Graham Yates' mesothelioma. See Mosser, 940 F.2d at 83 (holding that "it was for the jury to weigh the evidence and the credibility of each expert.").

Defendant Ford directs the court to a recent United States Bankruptcy Court case from the Western District of North Carolina, In Re: Garlock Sealing Technologies, LLC, No. 10-31607, 2014 WL 104021 (W.D.N.C. Jan. 10, 2014). There, the bankruptcy court issued an order estimating the defendant's aggregate liability for producing and selling certain products made

from chrysotile asbestos.  Id. at *1.  The court made certain findings of fact, including findings regarding the dosages of asbestos released by the defendant's products, the toxicity of chrysotile asbestos, and the reliability and probative value of various reports.  Id. at *3, *4, *78.  The matter was before the court to estimate aggregate liability, not on a motion for summary judgment.

On summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Indeed, the Garlock court itself distinguished the procedure for estimating aggregate liability from the typical trial of a personal injury or wrongful death claim, where it "would be necessary for the jury to resolve issues of causation in a binary fashion."  Id. at *3.

In its supplemental briefing, defendant Ford presents three additional cases in support of its argument that plaintiffs' evidence is insufficient to meet the Jones/Lohrmann standard.  One case involved only four brake replacement jobs.  Baxley v. Advance Auto Parts, Inc., No. 2:11-63922-ER, 2013 U.S. Dist. LEXIS 42045, at *14, 2013 WL 1100783, at *1, n. 1 (E.D. Pa. Jan. 8, 2013).  In another case, the plaintiff's evidence simply failed to indicate the regularity and frequency of his exposure.  Seitz v. Adel Wiggins Grp., No. 09-60004, 2010 U.S. Dist. LEXIS 144826, at *5-9, 2010 WL 8880458, at *1, n. 1 (E.D. Pa. Sept. 17, 2010).  In a third case, plaintiff gave conflicting testimony regarding whether he could remember the products that he worked with while in the Navy, and provided a conclusory affidavit in an attempt to remedy the discrepancies of his account.  Mills v. ACANDS, Inc., No. 1:00-CV-33, 2005 U.S. Dist. LEXIS 44470, at *13-15, 2005 WL 2989639, at *1-3 (W.D.N.C. Nov. 7, 2005).  None of these cases are sufficiently analogous, where plaintiff Graham Yates has testified definitively about repeated exposures to a specific product on a daily basis over a five-month period.

40

More persuasively, defendant Ford musters Fourth Circuit precedent showing that a court should consider additional factors to frequency, regularity and proximity. In White v. Dow Chemical Company, 321 F. App'x 266 (4th Cir. 2009), the court stated that, to meet the evidentiary burden of proximate cause in toxic exposure cases, a plaintiff "must demonstrate the *amount*, *duration*, *intensity*, and frequency of exposure." Id., at 273 (emphasis added). While White concerned exposures to toxic chemicals rather than asbestos, the Fourth Circuit has taken note of the intensity of exposure in an asbestos case, Haislip v. Owens-Corning Fiberglas Corp., No. 95-1687, 1996 WL 273686 (4th Cir. May 23, 1996). In that case, the court found plaintiff had met its burden of proof for causation, noting testimony that the decedent "was exposed to *heavy concentrations* of asbestos dust from OCF-Kaylo over at least a nine-month period." Id. at *2 (emphasis added).

Even considering amount, duration and intensity of exposure, plaintiffs have provided sufficient evidence to create a jury issue. Mark and Hays noted that concentrations of asbestos which can be produced by opening and packing brake boxes rose to levels substantially above the atmospheric background rate. They also note the propensity of asbestos fibers to remain suspended in the air some time after their release. Finally, plaintiff Graham Yates testified that he opened a large number of boxes multiple times, which may lead a jury to infer a high cumulative amount of exposure. It remains for the jury to determine whether these exposures may have been a substantial cause of his mesothelioma.

Because the court finds plaintiff's job at Sanders meets the Jones/Lohrmann test, it is not necessary to analyze whether the test would be satisfied as to his other activities. He has shown "more than a casual or minimum contact" with defendant Ford's product.

Accordingly, summary judgment for defendant Ford is denied as to plaintiffs' claims for negligence (First Cause), and failure to warn (Fifth Cause).

41

2.      Honeywell

Resolution of the issues here is largely predetermined by the above analysis regarding claims against defendant Ford.   Plaintiffs' cases against both defendants concern asbestos-containing brake products, plaintiff Graham Yates' exposures occurred around the same timeframe, and defendant Honeywell's arguments have largely mirrored defendant Ford's.

For the reasons explained above, the record indicates a genuine issue of material fact concerning whether defendant "should have known" of a substantial risk regarding Bendix brakes.   Accordingly, the court will reconsider its decision to grant summary judgment with respect to plaintiffs' failure to warn claim (Fifth Cause).   However, plaintiffs do not direct the court to sufficient evidence showing that defendant Honeywell had requisite knowledge of the risk so as to act with "conscious and intentional disregard of and indifference to the rights and safety of others."   Thus, the court maintains its decision to grant summary judgment to plaintiffs on their claim for willful and wanton conduct (Third Cause).

Further, because the evidence of defendant Honeywell's knowledge remains insufficient to create a genuine issue of material fact, plaintiffs cannot show that defendant Honeywell made fraudulent statements or false representations (Fourth Cause), thus warranting summary judgment on this claim as well.

Plaintiffs have provided sufficient evidence that plaintiff Graham Yates was exposed to asbestos from Bendix brakes on a "on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."   Jones, 69 F.3d at 716.   Plaintiff testified to assisting an average of one-to-two brake jobs per week, for approximately a year.   He testified that the mechanics would sand the new Bendix brakes before installing them, which would create dust that he breathed.   He also testified that he swept the floors after the large majority of these brake changes.   Along with Mark's expert opinion that plaintiffs' exposure to Bendix

42

brakes was a substantial cause of his mesothelioma, supported by studies that have shown sanding and sweeping releases asbestos fibers in significant concentrations, this evidence is sufficient to meet the Jones test. Because plaintiff has satisfied the Jones/Lohrmann minimum exposure test with respect to this job, it is not necessary to separately analyze the other capacities in which he alleges exposure to defendant Honeywell's product.

Accordingly, summary judgment is denied with respect to plaintiffs' claims for negligence (First Cause) and failure to warn (Fifth Cause) also against defendant Honeywell.

## CONCLUSION

In accordance with the foregoing, the court GRANTS in part, and DENIES in part the motions now before it. For the reasons given:

1. Summary judgment is GRANTED for defendants regarding plaintiffs' claims for breach of implied warranty (Second Cause);

2. The court maintains its earlier decision to grant summary judgment for defendants regarding plaintiffs' claims for willful and wanton conduct (Third Cause) and false representation/fraud (Fourth Cause); and

3. Summary judgment is DENIED for defendants regarding plaintiffs' claims of negligence (First Cause), and failure to warn (Fifth Cause).

The parties are DIRECTED to confer with each other, and with the other remaining defendants in this case, within twenty-one (21) days and make joint report to the court as to estimated trial length, alternative suggested trial date settings, suggested alternative dispute resolution techniques to be employed prior to trial in attempt to resolve remaining issues as between the parties, and any other matter bearing on the parties' pretrial and trial preparations.

SO ORDERED, this the 30th day of September, 2014.

LOUISE W. FLANAGAN
United States District Judge