IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CV-752-FL

| | |
|---|---|
| REBECCA FUQUAY YATES, Individually and as Executor of the Estate of GRAHAM YATES, Deceased, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| FORD MOTOR COMPANY and HONEYWELL INTERNATIONAL, INC., successor-in-interest to Bendix Corporation f/k/a Allied-Signal, Inc., | ) ) ) ) ) ) |
| Defendants. | ) |

ORDER

This matter comes before the court on plaintiff's motion for reconsideration (DE 471) of the court's June 29, 2015, order (DE 455) excluding testimony of Dr. Eugene Mark ("Mark"). Also before the court is the motion to strike (DE 480) by defendant Ford Motor Company ("Ford"), joined by defendant Honeywell International, Inc. ("Honeywell"). The issues raised have been fully briefed and are ripe for ruling. For the following reasons, defendants' motion to strike is denied, and plaintiff's motion for reconsideration is denied.

**STATEMENT OF THE CASE**

The court incorporates by reference the statement of the case from its June 29, 2015, order, updated herein to reflect case activity from that date to present. In the court's June 29, 2015, order, as pertinent to the instant reconsideration motion, the court excluded testimony of plaintiff's expert, Mark, pursuant to <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993).

Following the court's order, on July 2, 2015, defendant Ford filed a motion for summary judgment and motion to dismiss all claims against it (DE 462), as a result of the court's ruling in its June 29, 2015, order. Defendant Honeywell filed a motion to reconsider (DE 459) the court's September 30, 2014, summary judgment order, on the same basis.

On July 7, 2015, plaintiff moved to continue trial, noting an intention to file a motion for reconsideration of the court's June 29, 2015, order, and seeking time to obtain a different causation expert. That same date, the court held a telephonic scheduling conference, wherein the court directed plaintiff to file a motion for reconsideration by July 10, 2015, with response and reply briefs due as prescribed by the Local Civil Rules. The court stayed briefing as to the defendants' dispositive motions pending resolution of plaintiff's motion for reconsideration. The court denied the motion to continue insofar as it sought time to obtain a different causation expert.

The parties' briefing on the motion to reconsider concluded August 12, 2015. On September 8, 2015, plaintiff filed a notice of suggestion of subsequently controlling decided authority. On September 9, 2015, defendant Ford, as later joined by defendant Honeywell, filed a motion to strike the notice.

**COURT'S DISCUSSION**

A.  Standard of Review

Unless certified as final, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "[A] district court retains the power to reconsider and modify its interlocutory judgments, including

2

partial summary judgments, at any time prior to final judgment when such is warranted." Am. Canoe Assoc. v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir.2003). "The power to reconsider or modify interlocutory rulings 'is committed to the discretion of the district court,' and that discretion is not cabined by the 'heightened standards for reconsideration' governing final orders." Saint Annes Dev. Co. v. Trabich, 443 F. App'x 829, 832 (4th Cir. 2011) (quoting American Canoe, 326 F.3d at 514-15)); see also Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1473 (4th Cir.1991) (stating that interlocutory orders "are left within the plenary power of the Court that rendered them to afford such relief from them as justice requires").

"[D]octrines such as law of the case . . . have evolved as a means of guiding that discretion." Am. Canoe Ass'n, 326 F.3d at 515 (citing Sejman v. Warner–Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir.1988)). According to the law of the case doctrine, "earlier decisions of a court become law of the case and must be followed unless '(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" Am. Canoe Ass'n, 326 F.3d at 515 (quoting Sejman, 845 F.2d at 69).

B.  Analysis

    1.  Motion to Strike

Defendants argue that plaintiff's notice of subsequently decided controlling authority should be stricken because it does not list any subsequent "controlling" authority, as specified in Local Rule 7.1(g). The notice, however, conforms to the form required by the Local Rule, and the determination whether the subsequent authority is controlling is a substantive determination the

3

court has made in conjunction with its ruling on the motion to reconsider. Therefore, striking the notice is not warranted, and the motion to strike is denied.

2. Motion for Reconsideration

In her motion for reconsideration, plaintiff argues that the court misapplied Daubert and Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999), in its June 29, 2015, order. Plaintiff raises multiple issues regarding the court's application of those cases and the court's evaluation of the proffered testimony by Mark. Many of the issues now raised, however, previously were addressed in the court's June 29, 2015, order, and the court rests on its prior analysis of such issues.

For example, plaintiff contends the court erred by requiring Mark to establish a hazardous level of "chrysotile" asbestos, not a hazardous level of "asbestos" generally. The court previously discussed in detail the shortcomings in Mark's opinion resulting from his failure to distinguish sufficiently between fiber types that have different levels of potency. (See June 29, 2015, Order at 17-18, 22-25, 30). Plaintiff contends the court misunderstood and misstated the significance of Mark's opinion regarding the levels of exposure indicated by the presence of visible dust. The court previously discussed the flaws in Mark's opinions regarding visible dust. (See id. at 16-21). Plaintiff argues the court erred in faulting Mark's reliance on certain epidemiological studies but not others. The court previously addressed Mark's treatment of such studies. (See id. at 6, 26-30).

Plaintiff also argues, in comparison to Westberry, that the court erred in not crediting Mark's reliance upon Material Safety Data Sheets ("MSDSs"). Where the court did not previously discuss Mark's reference to MSDSs, nor make detailed comparison to Westberry, the court now writes separately to address these issues.

4

In his report, in support of his opinion that "all types of asbestos can cause mesothelioma," Mark cites to various sources, including the "FORD MSDS Sheet" and "Honeywell Friction Materials MSDS Sheet." (DE 332-7 at 18). A Ford MSDS in the record, comprising a compilation of information and warnings concerning a Ford brake shoe product, dated July 1998, references the Occupational Safety and Health Administration ("OSHA") and other regulatory agencies. (DE 392-7). In a section titled "Health Hazard Data," it states "prolonged and repeated exposure to dust from maintenance actions may lead to asbestosis and mesothelioma. . . . Explanation Carcinogenicity: Asbestos is listed by IARC, NTP & OSHA as a human carcinogen." (Id. at 4). In a section titled "Precautions for Safe Handling and Use" it states "molded asbestos composition friction linings do not present a hazard. Only when the parts are placed in service are the asbestos fibers released. Do not breath airborn [sic] asbestos dust." (Id.). In a section titled "Control Measures" it states "exposure to airborne asbestos shall not exceed 0.2 F/CC TWA." (Id.).

A Honeywell (Bendix) MSDS in the record, dated March 1, 1988, similarly states "[t]he following data may be used to comply with OSHA's Hazard Communication Standard 29 CFR 1910.1200." (DE 332-5 at 2). Under a section titled "Hazardous Ingredients/Identity Information," the MSDS states "Asbestos (Chrysotile) – OSHA – 0.2 fiber/c.c. . . . ." (Id.). Under a section titled "Health Hazard Data," the MSDS states "Inhalation of concentrations of airborne asbestos fibers in excess of the OSHA limits may be hazardous to health and may cause serious bodily harm, such as asbestosis, lung cancer or mesothelioma." (Id. at 3). Under a section titled "Special Precautions," it states "The Friction Material product, as shipped, is not considered hazardous, but machining (grinding and drilling) and/or normal use may create asbestos dust or airborne asbestos fibers in excess of OSHA standard and should be considered hazardous." (Id. at 4).

5

As noted in the court's June 29, 2015, order, "[i]n order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, [a] plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." Westberry, 178 F.3d at 263. Dr. Mark's opinion, insofar as dependent upon the MSDSs for support, does not provide a reliable basis for determining the general level of exposure to chrysotile asbestos that is hazardous to humans.

The MSDSs are produced in accordance with industry regulatory requirements. For example, 29 CFR 1910.1200, referenced in the Honeywell MSDS, provides a framework under which MSDSs are to be produced:

> (a)(1) The purpose of this section is to ensure that the hazards of all chemicals produced or imported are classified, and that information concerning the classified hazards is transmitted to employers and employees. . . .
>
> (2) This occupational safety and health standard is intended to address comprehensively the issue of classifying the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, . . . .

While both the Ford MSDS and Honeywell MSDS specify that "exposure to airborne asbestos shall not exceed 0.2" fibers per cubic centimeters, the documents do not provide a source for this specification. (DE 392-7 at 4; DE 332-5 at 2). Rather, the documents suggest that this limit of exposure was set pursuant to the regulatory authority of OSHA and related agencies. (See id.). "[I]n exercising its discretion as a gatekeeper, a court may refrain from treating a MSDS as reliable until it is presented with scientific evidence justifying the relevant statements found within the MSDS." Johnson v. Arkema, Inc., 685 F.3d 452, 465 (5th Cir. 2012).

In addition, the MSDSs suggest that a time duration in addition to concentration is a necessary consideration. For example, the Ford MSDS states that "prolonged and repeated exposure

6

to dust from maintenance actions <u>may lead</u> to asbestosis and mesothelioma." (DE 392-7 at 4) (emphasis added). Likewise, the Honeywell MSDS states that "machining (grinding and drilling) and/or <u>normal use</u> <u>may create</u> asbestos dust or airborne fibers in excess of OSHA standard and <u>should be considered</u> hazardous." (DE 332-5 at 4) (emphasis added). By suggesting that prolonged exposure or normal use may create hazardous conditions, the MSDSs leave unspecified a durational component of exposure that is critical under the facts of this case.

Furthermore, qualifications in the MSDS statements, such as "may lead . . . mesothelioma" "may create . . . asbestos dust," and "should be considered hazardous," undermine the utility of these documents as scientific sources. Because they are produced by the defendant corporations, and because they are prophylactic measures aimed at compliance with regulations, they are not in themselves supportive of Mark's opinion as to the levels at which defendants' products cause mesothelioma.

Comparison to <u>Westberry</u> is instructive. There, the court addressed whether there was a scientific basis to "'rule in' talc as a possible basis for [the plaintiff's] sinus condition" in that case. <u>Westberry</u>, 178 F.3d at 264. The court noted "it was undisputed that inhalation of high levels of talc irritates mucous membranes." <u>Id.</u> In doing so, the court cited a MSDS provided by the defendant to the expert physician conducting an examination of the plaintiff, which provided that "inhalation of dust in <u>high concentrations</u> irritates mucous membranes." <u>Id.</u> (emphasis added). At this point, <u>Westberry</u> is distinguishable, as an initial matter, from the instant case in two key respects. First, there was no dispute regarding the relevant level of talc necessary to pose a hazard, whereas such level for chrysotile asbestos sharply is disputed in the instant case. Second, there was no issue raised as to the reliability of the MSDS to confirm the undisputed hazardous level used in <u>Westberry</u>,

7

whereas defendants contest use of the MSDSs in this case. The divergence between this case and Westberry is even more pronounced in the remaining aspects of the court's analysis of the expert opinion in that case.

In particular, in Westberry, no more discussion of the hazardous level of talc was necessary, where, among other factors, "there was evidence of a substantial exposure." 178 F.3d at 264 (emphasis added). The plaintiff testified that "he was exposed to very high levels of airborne talc throughout his workday." Id. (emphasis added). "[T]alc . . . was so thick that one could see footprints in it on the floor" and "it covered him and his clothes." Id. According to the court, "[t]his testimony concerning the level of airborne talc" showed exposure "to high concentrations of airborne talc, and there was no dispute that exposure to high concentrations of airborne talc could cause irritation to mucous membranes." Id. (emphasis added).

Other factors bearing on the court's opinion included the examining physician's "differential analysis," a "standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Id. at 262 (emphasis added). As to this factor alone, the court observed "[w]e previously have upheld the admission of an expert opinion on causation based upon a differential diagnosis." Id. at 263. Also pertinent was the fact that the differential diagnosis "was supported in part by the temporal relationship between [the plaintiff's] exposure to talc and the problems he experienced with sinuses." Id. at 262.

In sum, while a MSDS was deemed sufficient in Westberry to provide confirmation of a generally hazardous level of exposure, under the facts and circumstances of the instant case, a clearer fit between the disputed general level of hazardous exposure and Graham Yates's actual exposure is required. See id. at 261 ("[T]he court has broad latitude to consider whatever factors

8

bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved.").

The court reaches this conclusion on the basis of multiple factors, none of which were present in Westberry. First, Mark's opinion on causation is not based upon differential diagnosis, and thus must find grounding in other scientific evidence. Second, unlike in Westberry, Mark must account for exposure to a similar, but more potent, amphibole form of asbestos substance encountered through Graham Yates's employment with the Navy, as a potential cause for injury. Third, unlike in Westberry, Mark must account for a limited duration and frequency of exposure, as well as distant timing in relation to the manifestation of injury. Finally, Mark must account for actual exposure amounts that cannot fairly be characterized, as in Westberry, as "substantial exposure" and "very high levels" of exposure. Mark's opinion, however, fails reliably to account for this unique combination of factors not present in Westberry.

In sum, plaintiff has not asserted any basis for reconsideration of the court's June 29, 2015, order. For the reasons stated above, and for the reasons set forth in the June 29, 2015, order, Mark's opinion on causation must be excluded.

## CONCLUSION

Based on the foregoing, plaintiff's motion for reconsideration (DE 471) is DENIED. In light of the court's ruling on plaintiff's motion for reconsideration, the court lifts the stay on briefing on defendants' remaining dispositive motions in this case. (See DE 459, 462). Plaintiff shall file a response, if any, to defendants' motions within **21 days** of the date of this order. Defendants shall file a reply, if any, within **10 days** of the date of any response.

9

SO ORDERED, this the 5th day of November, 2015.

_____
LOUISE W. FLANAGAN
United States District Judge

10